## SACKETT v. SMITH.

(Circuit Court, S. D. New York. May 13, 1890.)

1. PATENTS FOR INVENTIONS—COMBINATIONS—WANT OF NOVELTY—FOUNTAIN-PENS.
    Letters patent No. 347,961, August 24, 1886, to George H. Sackett, for an improvement in fountain-pens, consists of a reservoir, or tubular holder, constructed with longitudinal grooves in the inner walls of its lower end, in combination with a pen, the lateral edges of which fit into the grooves, so as to hold the pen in place. *Held*, that the use of grooves for holding the pen in place, having been long known, was not patentable.

**2. SAME.**

Such patent, in so far as it consists of a slitted pen so fixed in the holder that the slit comes in contact with the ink held in the reservoir, so that the ink will be directed by capillary attraction down the split to the point of the pen, is not infringed by the use of a pen the slit of which is below the ink space in the reservoir.

**3. SAME.**

Letters patent No. 353,162, November 23, 1886, to George H. Sackett, for an improvement in fountain-pens, consists of an ink-reservoir closed air-tight at its top, and open and internally unobstructed at the bottom for the passage of air and ink, the ink being kept in the reservoir by the air pressure, a slitted pen attached to the bottom of the reservoir, and a lip or tongue, the inner surface of which is applied parallel with the pen, to form, conjointly with the surface and the slit of the pen, a channel for conducting the ink to the point of the pen. *Held,* that the patent must be confined to the precise form and arrangement of parts described in the specification and to the purpose therein indicated, since the use of the parts to accomplish similar results in analogous combinations was known before the date of the invention.

**4. SAME.**

Such patent, where it calls for a tongue or feeding-stem located within the reservoir, with its upper end extended to or near the closed upper end of the reservoir, is not infringed by the use of a pen with a feeding stem which only extends part of the way up the reservoir.

**5. SAME.**

Nor is a patent, the specifications of which call for an ink reservoir "open and unobstructed" at the lower end, infringed by the use of a pen-holder into the bottom of the reservoir of which is screwed a perforated nozzle, through which the ink is conducted to the pen, since such a nozzle forms an obstruction.

In Equity.

*James A. Whitney,* for complainant.

*Walter S. Logan,* for defendant.

COXE, J. This is an equity action for infringement of two letters patent granted to the complainant for an improvement in fountain-pens. The first of these patents, No. 347,961, is dated August 24, 1886; the second, No. 353,162, is dated November 23, 1886. The applications were filed April 23, 1883. In both patents the improvements relate to fountain-pens in which the ink is sustained in the reservoir by atmospheric pressure, and is supplied to the pen by capillary attraction as distinguished from the attraction of gravitation. No. 347,961, in so far as it has reference to the present issue, relates to an arrangement by which the pen is held in place at the lower end of the reservoir or holder. The interior surface of the reservoir is provided with grooves, into which the edges of the pen fit. The pen is thus held in position with its upper portion extending into the ink space of the reservoir, so that the ink may pass directly into the inner portion of the slit of the pen, and thus be transmitted to its point. The only claim of the patent alleged to be infringed is the second. It is as follows:

"(2) A reservoir or tubular holder constructed with longitudinal grooves in the inner walls of its lower end, in combination with a pen the lateral edges of which fit into said grooves, thereby insuring the retention of the pen in place, substantially as and for the purpose herein set forth."

In No. 353,162 the invention comprises certain novel means of insuring the downward flow of ink within the reservoir of a fountain-pen and the frequent and regular transmission of ink to the point of the pen. The ink reservoir or tubular holder is closed at its upper and open at its lower end. The pen is fixed at the lower end so that its slit is in close

proximity to the ink at the mouth of the reservoir. A lip or tongue, flexible if desired, is attached to the upper or, if preferred, to the under side of the pen, in such a manner as to provide a thin space between the pen and lip transverse to and in communication with the slit. The channel thus formed for conducting the ink to the point of the pen is T-shaped in its cross-section. By "the attraction of adhesion" the opposing surfaces of the channel insure the flow of the ink to the point of the pen when used in writing. This lip or tongue may be formed in any appropriate manner. It may consist of a slip of gold, rubber or other suitable material inserted in the same manner as the pen and parallel therewith, it may be inserted in a socket formed externally in the holder, it may be a prolongation of the holder itself, or it may be formed upon or attached to the lower end of the feeding-stem. "The feeding-stem is a device designed to insure the regular descent of the ink within the reservoir when the latter is of such diameter that under ordinary conditions the ink would be maintained in the upper part of said reservoir by atmospheric pressure from below, and thus interfere with the operation of the pen by failing to regularly supply the same with ink, the said stem being so constructed in itself or so arranged in relation to the walls of the reservoir as to provide what may be termed an 'internal capillary channel,' through which a small current of ink may flow downward, leaving the air in the surrounding space free to move upward, thereby insuring, more especially when the holder is of very small diameter, the automatic downward feeding of the ink to the upper portion of the pen, whence, by means hereinbefore explained, it is transferred to the point thereof. The said stem may therefore consist of a single flat strip of metal or other suitable material placed close to but not in actual contact with one of the sides of the interior of the reservoir, or of a single strip grooved or U-shaped in its cross-section, or its equivalent may be provided by longitudinally grooving the internal surface of the reservoir, the walls or surfaces of the said grooves serving the same purpose, because of their adhesive attraction, in substantially the same way as does the stem itself when applied as hereinbefore explained. It should be kept in mind that the feeding-stem facilitates the operation of filling the reservoir as well as the feeding of the ink to the pen."

All three of the claims are involved. They are as follows:

"(1) In a fountain-pen, the combination of the following elements, to-wit: an ink reservoir closed air-tight at its top and open and internally unobstructed at the bottom for the passage of air and ink, a slitted pen attached to the permanently open bottom of the reservoir, and a lip or tongue the inner surface of which is applied parallel with the pen to form, conjointly with the surface and the slit of the pen, a channel for conducting the ink directly from the open lower end of the reservoir to the point of the pen, all substantially as and for the purpose herein set forth.

"(2) In a fountain-pen, the combination of the following elements, to-wit: an ink-reservoir closed air-tight at its top and open and internally unobstructed at the bottom for the passage of air and ink, a slitted pen attached to the permanently open bottom of the reservoir, and a lip or tongue the inner surface of which is applied parallel with the pen to form, conjointly with the

surface and the slit of the pen, a channel for conducting the ink directly from the open lower end of the reservoir to the point of the pen, and a feeding-stem located within the reservoir and with its lower end connecting with the channel aforesaid, and with its upper end extended to or near the closed upper end of the reservoir to insure the descent of ink to said channel, all substantially as and for the purpose herein set forth.

"(3) In a fountain-pen, the combination of a holder or reservoir closed air-tight at the top and open and internally unobstructed at the bottom, a slitted pen, and a feeding-stem placed within said reservoir with its upper end extended to or near said upper end of said reservoir and provided at its lower end with the lip C, placed over and adjacent to the back and slit of the pen, all substantially as and for the purpose herein set forth."

The defenses are want of novelty and invention, unlawful expansion of the claims and non-infringement.

As to the second claim of No. 347,961 it is quite clear that if a construction is placed upon it broad enough to cover any pen it is void for want of patentability, and if confined to the exact combination described by the patentee it is not infringed. The English patent to William E. Wiley, sealed April 24, 1857, describes a tubular pen-holder for an ordinary dipping pen "made with two grooves on opposite sides of its interior for the purpose of holding the pen, the object being, by such means, to cause pens to be held in tubular holders in a central position." Other references show somewhat similar constructions. It is beyond question, therefore, that no one can hold a patent for a pen-holder the only alleged novelty being that it is provided with grooves for holding the pen in place. This method was old a quarter of a century ago, and even if it had not been suggested by Wiley and others, it is, at least, doubtful whether its use in a pen-holder would require an exercise of the inventive faculty in view of the many analogous uses to which grooves are put in all the mechanical arts. The claim cannot be upheld, therefore, if construed, as the complainant insists it should be, to cover an improvement which relates merely "to holding the pen in place in the lower end of a fountain-pen reservoir;" and, if it is limited to the peculiar form of pen described in complainant's patent the defendant does not infringe. He has no *slitted pen*, as that term is used in the patent. The upper end of the slit in his pen is far below the ink space of the reservoir. On the other hand, the fundamental idea of the complainant is to carry the ink to the point of the pen by bringing the upper end of the slit in direct communication with the ink in the reservoir, so that the ink will be directed down the slit by capillary attraction. In order to accomplish this a pen is used having a long slit and about twice the thickness of an ordinary steel pen. The defendant's structure, manufactured under a patent granted to Paul E. Wirt, has a thin gold pen about half the thickness of a steel pen. It is quite true that Wirt uses grooves, but he has a right to use them. He does not employ them to hold the complainant's pen in position, or to hold any pen in position, to accomplish the purpose set forth in complainant's patent. The court does not decide that this claim is invalid, but that if upheld at all it must be for a combination which the defendant does not use.

Regarding patent No. 353,162 it will be observed that claim 1 is for a combination in a fountain-pen containing the following elements: *First.* An ink reservoir closed air-tight at its top and open and internally unobstructed at the bottom, for the passage of air and ink. *Second.* A slitted pen attached to the permanently open bottom of the reservoir. *Third.* A lip or tongue, the inner surface of which is applied parallel with the pen, to form, conjointly with the surface and the slit of the pen, a channel for conducting the ink to the point of the pen. In short, it is for a fountain-pen consisting of a slitted pen inserted in the open and unobstructed end of the holder, the pen being provided with a parallel lip. The other claims are narrower than the first, additional elements being added. They will be considered in detail later on. In view of what was known prior to complainant's invention a broad construction of these claims is out of the question. Fountain-pens in many varieties and operating upon different principles had long been known. All this, if confined to 'the so-called "gravity" pens, is conceded. But the idea of using atmospheric pressure and a capillary feed was not original with the complainant. In the specification filed in the patent-office by Marvin C. Stone, October 15, 1881, before the earliest date fixed for the complainant's invention, the general principle of operation above alluded to is clearly enunciated. This evidence is important as corroboratory of the oral testimony showing what was actually constructed by Stone. He says, that the invention "consists in supplying ink to the pen from the fountain by capillary action consisting of plates conforming to the figure of the pen and applied thereto approximately in contact therewith on both the concave and convex surfaces." And again: "E is the compressible elastic porous ink-feeder which is used to retain ink in and feed air to the reservoir and to feed ink to the pen. * * * The operation of my invention is as follows: The pressure of the air upon the ink which saturates the feeder retains the ink in the holder. * * * The pen which is inserted between the two closely fitting plates that conform to its shape has its nibs constantly supplied with ink by the capillary action of the surfaces of the pen with the surfaces of its adjacent plates. * * * The two plates perform the double office of feeding the pen with ink by capillary action and serving also as a holder for the pen itself. * * * The holder or pen receptacle should hug the pen very tightly at every point in order that the capillary action may be as perfect and as little affected by gravity as possible." A patent was granted to Stone June 27, 1882, No. 260,134, for a fountain pen-holder. It is not pretended that the Stone pen was a perfect writing instrument, or that it can be compared in this regard with either the complainant's or the defendant's structures, but it cannot be doubted that the principle upon which these improved pens operate was known to Stone and by him embodied, though in a somewhat crude and unsatisfactory form, before the date of complainant's invention. Wirt, too, as early as the summer of 1881, had hit upon a similar line of investigation and had constructed a rudimentary pen which operated upon the capillary principle. This pen not only had an open reservoir in which the ink was

retained by atmospheric pressure, but also a lip applied to the pen for feeding the ink from the reservoir to the point of the pen. That he made such a structure is established by the testimony of nine witnesses, all of them unimpeached and, apparently, of high standing and respectability. At least five of them are entirely disinterested. Their testimony has been criticised with great severity and painstaking elaboration and several·discrepancies and inconsistencies are pointed out. But after all they agree, substantially, upon the main proposition, there is nothing improbable in their story, no motive has been shown for wholesale perjury and no view of the matter has been presented which will justify an arbitrary rejection of their testimony. The language of Judge SHIPMAN in *Hershey* v. *Blakesley*, 33 Fed. Rep. 922, seems peculiarly applicable. He says:

"I am fully aware of the ease with which honest witnesses can persuade themselves that they remember some by-gone circumstance which they are ingeniously induced to think that they remember; but, in this case, I do not perceive any manipulation of these witnesses, and I think that their testimony was not manufactured, and they were not mistaken. There is nothing improbable, either by reason of the state of the art or of the character of the improvement, in the history which is given."

Other evidence has been introduced, but it is unnecessary to discuss it, for it is already quite evident that the complainant did not enter an undiscovered field whose virgin soil had theretofore remained untrodden by the foot of the inventor, but that this is one of the cases referred to by the supreme court in *Bragg* v. *Fitch*, 7 Sup. Ct. Rep. 978, where the invention "is but one in a series of improvements all having the same general object and purpose; and that in construing the claims of the patent they must be restricted to the precise form and arrangement of parts described in the specification, and to the purpose indicated therein." In addition to what has already been said, applicable to all three of the claims, it will be noted that "a feeding-stem located within the reservoir * * * with its upper end extended to or near the closed upper end of the reservoir" is an element of the combinations covered by claims 2 and 3. It seems unnecessary to spend time in discussing the meaning of the words quoted. They are too plain to admit of doubt or cavil. There is no room for misunderstanding. An architect who agrees to run a ventilator shaft or a steam main to or near the roof of a many-storied building, does not fulfill his contract if his shaft ends at the story above the basement. So one who uses a pen with a feeding-stem which extends a third of the way up the holder does not infringe a claim which provides for a stem extending the entire distance, or nearly so. The language of these claims was adopted deliberately and with full knowledge of its restrictive import. The drawings not only show a feeding-stem extending to the upper end of the reservoir, but one actually inserted in and attached to the upper end. Surely, the claims do not cover, as the complainant insists, a stem which extends "to any desired point within the reservoir." The contention that the language under discussion means "to or near the closed upper end of that part of the re-

servoir which co-ordinates with the stem in doing the work and securing the required effect" is ingenious certainly but at variance with the plain import of the specification, claims and drawings. There is no process of reasoning by which a claim, expressly limited to a feeding-stem extending to the upper end of a pen-holder, can be construed to cover a stem which is wholly confined to the lower end of the pen-holder. It cannot be tortured into a construction so strained and unnatural. There is nothing ambiguous about the claim. The language is perfectly plain and simple. It is not a case where the court is permitted to speculate upon what might have been done or what should have been done in the patent-office. We are dealing now with what was done. Claims are construed as they are, not as they might be. The complainant accepted the patent with the claims thus limited and it is now too late to alter or extend them. He must abide by them as they stand. As was said by Mr. Justice BRADLEY in *Keystone Bridge Co.* v. *Phœnix Iron Co.*, 95 U. S. 274, 278:

"When a claim is so explicit, the courts cannot alter or enlarge it. * * * They [the patentees] cannot expect the courts to wade through the history of the art, and spell out what they might have claimed, but have not claimed. * * * There [in the patent-office] his claim is, or is supposed to be, examined, scrutinized, limited, and made to conform to what he is entitled to. If the office refuses to allow him all that he asks, he has an appeal. But the courts have no right to enlarge a patent beyond the scope of its claim as allowed by the patent-office. * * * When the terms of a claim in a patent are clear and distinct, (as they always should be,) the patentee, in a suit brought upon the patent, is bound by it. *Merrill* v. *Yeomans*, 94 U. S. 568. He can claim nothing beyond it. * * * As patents are procured *ex parte*, the public is not bound by them, but the patentees are. And the latter cannot show that their invention is broader than the terms of their claim."

The defendant is selling pens constructed under letters patent No. 311,554, granted to Paul E. Wirt February 3, 1885. Into the lower end of defendant's pen-holder is screwed a perforated nozzle through which the ink is conducted to the pen. The passage through the nozzle, when compared with the interior of the reservoir, is very small. The reservoir is obstructed at the bottom by the presence of this nozzle. The ink does not flow as freely with it as it would without it. "Unobstructed," means free from obstacles or impediments which check, hinder or retard passage. It is by no means synonymous with "open." The complainant clearly understood this for he uses both words—"open and unobstructed." He meant to convey the idea of a reservoir not only open but unobstructed also. His drawings show this. Had a pen-holder like Wirt's been presented as a reference by the patent-office officials the complainant would probably have argued that it was not an anticipation, because a reservoir contracted from a large opening at the bottom to a comparatively small one was not an unobstructed but an obstructed reservoir. The defendant's holder is open because it has a hole at the bottom, but to say that the insertion of the nozzle does not impede and obstruct the flow of ink from the reservoir is like saying that a river is not obstructed by a dam, or a stove-pipe by a damper. The defend-

ant does not use the feeding-stem of the second and third claims. Not only does his stem stop far short of the upper end of the reservoir, but it is not provided with the U-shaped groove, or placed close to the 'wall of the reservoir so as to form the "internal capillary channel" of the patent. Other differences between the two structures exist, but they are of minor importance. Sufficient dissimilarity has already been pointed out. I am constrained to hold, therefore, that the defendant does not infringe. Where the patent relates only to a progressive step in a series of improvements the tendency of modern decisions is more than ever towards a strict construction of claims and a finding of non-infringement in doubtful cases. *Snow* v. *Railway Co*, 121 U. S. 617, 7 Sup. Ct. Rep. 1343; *Newton* v. *Manufacturing Co.*, 119 U. S. 373, 7 Sup. Ct. Rep. 369; *Paving Co.* v. *Schalicke*, 119 U. S. 401, 7 Sup. Ct. Rep. 391; *Hartshorn* v. *Barrel Co.*, 119 U. S. 664, 7 Sup. Ct. Rep. 421; *Grier* v. *Wilt*, 120 U. S. 412, 7 Sup. Ct. Rep. 718; *Brewing Co.* v. *Gottfried*, 128 U. S. 158, 170, 9 Sup. Ct. Rep. 83; *McCormick* v. *Graham's Adm'r*, 129 U. S. 1, 9 Sup. Ct. Rep. 213; *Sargent* v. *Burgess*, 129 U. S. 19, 9 Sup. Ct. Rep. 220; *Peters* v. *Manufacturing Co.*, 129 U. S. 530, 9 Sup. Ct. Rep. 389; *Water-Meter Co.* v. *Desper*, 101 U. S. 332. It would seem that the world is wide enough for both these patentees, and that each should be permitted to enjoy the fruits of whatever novel features he has supplied to the art. The bill is dismissed.