# BOYNTON *v.* TAGGART.

PATENTS; DENTAL PATTERNS AND MOLDS; PRIOR USE.

1. The defense of prior use in an infringement suit must be sustained if the testimony amounts to proof beyond a reasonable doubt of such prior use, as the claims of the patent must fall. (Citing sec. 4886, Rev. Stat., U. S. Comp. Stat. 1901, p. 3382.)

2. A patent for the process of making patterns and molds for dental inlays and the like, by the lost wax process, is invalid, where, for more than two years prior to the date of the original application for the patent, the process has been publicly practised upon many occasions by the dental profession.

No. 2426.   Submitted December 5, 1912.   Decided February 25, 1913.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia sustaining the validity of certain letters patent.                    *Reversed.*

The facts are stated in the opinion.

*Mr. Edward T. Fenwick, Mr. L. L. Morrill, Mr. Fred B. Rhodes,* and *Mr. H. H. Bliss* for the appellant.

*Messrs. Dyrenforth, Lee, Chritton, & Wiles,* and *Mr. Francis M. Phelps* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

This appeal involves a decree in the supreme court of the District in an infringement suit sustaining the validity of letters patent numbered 872,978, granted December 3, 1907, to William H. Taggart, the appellee, upon a divisional application filed July 12, 1907, of original application filed January 12, 1907.

According to the specification, the invention relates to "a new and useful improvement in methods for making molds for dental inlays and the like." It is further stated that these molds are particularly designed for the casting of dental fillings of the type known as inlay fillings, but that "they can obviously be used for certain other types of work of a fine grade, one of their principal fields of usefulness being in the formation of other types of dental metal work, as, for instance, bridge work and the like." Searching the original specification we find that the phrase "certain other types of work of a fine grade" was intended to embrace the art of manufacturing special pieces of jewelry, for it is there written: "The process can also be used in the art of manufacturing jewelry, wherever it is desired to make a single piece of any kind, as, for instance, where a piece of jewelry is made to order. The manufacturer can carve up a pattern in wax with comparative ease, as the graving operation in wax requires neither the high class of tools nor high manual skill required for graving in metal. * * * After the pattern is completed in wax, the process proceeds as herein set forth, and an absolutely perfect duplicate can be obtained." The claims are twelve in number, of which we reproduce the following five as representative:

"1. The process of making patterns for dental inlays and the

like, which consists in molding plastic material upon the tooth surface to the size and shape of the desired inlay."

"3. The process which consists in making a pattern of a tooth filling within the cavity to be filled and in contact with the surface thereof, removing the pattern from the cavity, forming about the pattern a mold provided with a sprue, and melting out the pattern."

"6. The process which consists in making a pattern for a cast tooth filling within the cavity to be filled and in contact with the surface thereof, from plastic material capable of being changed from its solid condition, supporting the pattern upon a sprue former, inclosing the pattern in a primary body of mold material, supporting the pattern and primary body of mold material within a flask by means of the sprue former, adding a secondary body of mold material, removing the sprue former and removing the pattern from the mold thus formed by way of the sprue."

"8. The process of making molds for casting dental fillings and the like, which consists in forming a pattern of the desired size and shape, forming a mold about said pattern with a depression in the mold adapted to form a crucible forming a sprue hole extending from the depression to the pattern, and then removing the pattern."

"12. The method of forming patterns for casting dental inlays, which consists in forming moldable material to the size and shape of the desired inlay in the cavity to be filled and against its walls."

An examination of these claims discloses that they do not cover, nor purport to cover, a new process for filling teeth. On the contrary, they relate solely to the process of making *patterns* out of plastic material or wax, and the process of forming a *mold* about such pattern, from which mold a duplicate of the pattern may be produced. The words "dental inlays and the like," as used in the claims of the patent, when read in connection with the specification, as they must be read, clearly embrace "bridge work and the like." It is unnecessary here to determine whether they have even broader signification, although, as previously

stated, the specification specifically includes "certain other types of work of a fine grade."

To produce the pattern to which these claims relate, an impression in wax or other plastic material is obtained, that is to say, if a tooth cavity is to be filled, wax is first inserted therein, chilled, and removed. When thus removed a pattern of the filling has been obtained. Substantially the same process would be followed in obtaining a pattern for a bridge between other teeth. After obtaining this pattern it is put upon a short piece of wire, technically called a sprue former, initially coated with investment material, and then inclosed in a secondary layer of investment material. This is allowed to set, when it is sufficiently heated to volatilize the wax. The mold is then complete, and the gold or other metal may be inserted through the sprue hole.

We will here briefly review the prior art. It is not disputed that the art of producing metal castings by means of a mold formed of a wax pattern is very old. It is in evidence that this art was practised by the ancient Greeks and Romans and was extensively used in the Middle Ages for producing statuary and other accurate castings. This process is known as the *Cire perdue* or "Lost Wax" process. See Simpson Bolland's "Encyclopedia of Founding," page 515. It is conceded that Cellini used this process hundreds of years ago in casting one of his most celebrated statues. It is further conceded that the burnished inlay process was also well known for many years prior to the application for this patent. See Patent No. 402,352 to Robinson, dated April 30, 1889. In that process a piece of platinum or gold foil is placed in the tooth cavity and rubbed or burnished against the walls of the cavity. The foil, then called a matrix, is usually filled with wax, so as to conform to the original shape of the tooth, then removed, and precisely the same process followed as in the Taggart process; in other words, the only difference between the burnished inlay process and the Taggart process lies in the use of the foil, which subsequently fuses with the "solder" or lower carat gold. The patent to Hollingsworth, No. 708,511, dated September 9, 1902, covers machines for casting dental bridges. The wax pattern in the Hollings-

worth process is treated in substantially the same manner disclosed by the Taggart patent, and the casting process disclosed by Hollingsworth in no material way differs from that disclosed by Taggart. The patent to Reese, No. 200,760, dated February 26, 1878, covers a mold for casting dental plates. It is thus seen that it was old long prior to the Taggart patent to manufacture dental castings by the lost wax process.

It is conceded that appellant practised the process disclosed by the claims of the patent in suit, the defense being the invalidity of these claims. In addition to the prior art, as disclosed in the patents to which reference has been made, much testimony was introduced by appellant tending to show that the identical process disclosed by this patent was, for more than two years prior to the date of the original application, practised by dentists throughout the country. Of course, if the testimony amounts to proof beyond a reasonable doubt of such prior use, the defense must be sustained, as the claims must fall. Sec. 4886, Rev. Stat. U. S. Comp. Stat. 1901, p. 3382; *Forncrook* v. *Root,* 127 U. S. 176, 32 L. ed. 97, 8 Sup. Ct. Rep. 1247; *Peters* v. *Active Mfg. Co.* 129 U. S. 530, 32 L. ed. 738, 9 Sup. Ct. Rep. 389. We shall here review that evidence.

Dr. Oscar H. Simpson, of Dodge City, Kansas, a dental practitioner since 1882, a graduate of the Ohio College of Dental Surgery, a member of the State Board of Dental Examiners, at one time president of the State Dental Association, and a member of the National Board of Dental Examiners, testified that he gave his first inlay clinic in about 1887, and had since given clinics at Topeka, Wichita, and Newton, Kansas, at the World's Congress of Dentists at St. Louis, and at other places. The witness described his progress in inlay work, and further described in detail the method he employed in about 1898 to form a dental tip or crown for a boy by the name of Malcolm Judd. Without going into detail, it is sufficient to say that the process described by the witness was substantially the process disclosed by the patent in suit. The original apparatus by which the process was practised was introduced in evidence. Not only this, but the original work, which had been subsequently removed after per-

forming a useful purpose, was also introduced. While this piece of work was attacked by experts for the complainant, we, nevertheless, are fully convinced that the process by which it was made was the process disclosed by the Taggart patent in suit. Dr. Simpson gave other instances of employing this process in his practice. He further testified that in the clinic at Wichita, Kansas, in about 1898 or 1899, he described the method which he employed to form the Malcolm Judd tip or crown. In this he was corroborated by Dr. B. L. Shobe, a dentist residing at Bartlesville, Oklahoma, who remembered very distinctly the clinic at Wichita, because he then thought the process adapted to a case which was troubling him. After watching the clinic, he returned to his home and tried to practise the process, but failed. He then consulted Dr. Simpson, at Dodge City, learned the cause of his failure, and was thereafter able to practise the process. In his testimony he gave the names and addresses of different persons for whom he did that kind of work. No matrix was employed in the clinic Dr. Simpson gave at Wichita, the wax pattern coming in direct contact with the tooth. A Mr. Lyle S. Henkel, now a locomotive engineer, an entirely disinterested witness, testified in direct corroboration of Dr. Simpson. From 1893 until March, 1897, he studied dentistry with Dr. Simpson, and his testimony is clear and convincing that Dr. Simpson, during that time, practised the process disclosed in complainant's patent in making cast inlays for teeth.

Dr. Judson O. Ball, of Mt. Pleasant, Iowa, a dental practitioner since 1880, testified concerning inlay work. In about 1889 he prepared a tooth cavity, then ground a piece of porcelain to fit the cavity, and cemented the porcelain in place. This was his first work of that kind. In 1894 a Mrs. Shaffer, living at Merrimac, Iowa, 16 miles from Mt. Pleasant, came by appointment to have a Logan crown set. The crown had been ordered by mail, but had not arrived. The doctor, desiring, if possible, to complete the work upon that occasion, took a wax impression, and from it, by practising the process disclosed by the patent in issue, produced a casting which he used successfully. He subsequently practised the same process in the spring

of 1895 in doing work for Dr. A. O. Pitcher, of Mt Pleasant, Iowa. Sometime between 1895 and 1899, he employed the process in doing work for Mrs. William Gladden, also of Mt. Pleasant. In his testimony he described the work in detail. During September, 1903, the doctor set a large inlay for Mr. F. S. Finley, a lawyer of Mt. Pleasant. This inlay was for the right central incisor decayed on the central proximal, involving both the facial or labial and lingual surfaces of the tooth, and also the lower cutting edge surface. After the cavity was prepared, wax was inserted to conform with the labial, lingual, and proximal surface of the tooth; in other words, a wax impression of the filling or casting was taken. A casting was then produced by a process substantially the same as that of the Taggart patent. This casting was then cemented in place, and has since done service. The original apparatus by which this casting was made was introduced in evidence. The names and addresses of other parties for whom work of a similar character was done by Dr. Ball were given by the witness. Mr. Finley, formerly city solicitor of Mt. Pleasant, Iowa, his home, testified in corroboration of Dr. Ball. He remembered that some time during the year 1903, when he and Dr. Ball were together in the city council, the doctor had filled a front tooth for him. The witness was asked what circumstances, if any, impressed this particular occurrence upon his mind, and replied: "The manner of putting this filling in was impressed upon my mind from the fact that the tooth was prepared and an impression taken of the tooth and the filling cast and cemented into place, which was different from any other filling that Dr. Ball had ever put in for me, and I inquired of the doctor at the time the filling was put in about the manner of his doing it and he explained it to me. He told me that he had taken the wax impression of the cavity. I knew that he had done this; he then showed me the apparatus where he had set the wax filling on a point of a cone and put a cylinder over it and then used some substance something like plaster paris to get the form of the filling; he then removed the cylinder with the plaster cast, removed the metal cone, and explained to me how he heated the plaster cast or the wax in the plaster cast,

how it would come out and leave the cavity. He then filled the cavity in some way with gold, making the cast which was cemented into my tooth. I merely have his explanation as to how he made the filling, aside from the fact that I knew he took the wax impression, that the filling was put in in one piece, and he showed me the apparatus where he said he had made it, and explained to me the process of making it as I have explained it above." The witness stated that the apparatus which had been introduced in evidence was exactly the same in principle and similar in fact to the one used in making the casting for his tooth. There was no cross-examination of this witness, nor was an examination sought to be made of the tooth which the testimony showed had been filled in 1903. One Robinson, who had been Dr. Ball's janitor for seventeen years, also testified concerning the doctor's use of the process here involved.

Dr. Valentine H. Hobson, of Richmond, Kentucky, testified to the circumstances surrounding the practice, in 1889, of the process of the patent in issue. The Doctor subsequently practised the process for other patients, and gave their names and addresses.

Dr. William E. Harper, of Chicago, Illinois, a man of wide preliminary training, testified to casting dental bridges by the present process, and to the giving of clinics in 1893 or 1894, in which he explained it. The names and addresses of people for whom he had made cast bridges were given.

Dr. Merrill W. Hollingsworth, who, as we have seen, in 1902, patented a machine for casting dental bridges, and who, therefore, was thoroughly familiar with the lost wax process in the manufacture of dental castings, testified to having made bridge castings by the process in issue as early as 1893, the names and addresses of different people for whom he had made castings being given. Dr. Hollingsworth's testimony was corroborated by Dr. George A. White.

Dr. Jacob G. Schottler, of Milwaukee, Wisconsin, a practising dentist and also a teacher of dentistry, testified to the casting of a gold inlay in 1898 by the process in issue. This casting was

for a patient who refused to have the work done in the old way, owing to nervousness. The name of the patient was given.

Dr. George W. Blaesser of Cedarburg, Wisconsin; Dr. Emil M. Kapitan, of Manitowoc, Wisconsin; Dr. John M. Higgins, of Chilton, Wisconsin, all testified in corroboration of Dr. Schottler. A Mr. Thomas H. Savage, a stenographer, testified that Dr. Schottler took a wax impression of one of his teeth that had been broken off, and from this produced a tip which was cemented in place. The witness was asked in cross-examination whether he had any objection to permitting an examination of this tooth by a dental expert, and replied that he did not. The record does not show that any such examination was made, however.

We come now to the testimony of Dr. George B. Martin, of Frankfort, Indiana, who has been engaged in the practice of dentistry since 1884. In 1888 Dr. Martin organized the Indianapolis Post Graduate School of Prosthetic Dentistry, and was President of the school and also instructor, his subjects including crown, bridge, and inlay work. When he took up the practice of dentistry, he was already familiar with the making of patterns for metal castings in other lines of work. The doctor testified in detail to practising the process here involved and to the disclosure of that process to his students and others. He introduced in evidence various apparatus by which his work was accomplished. His testimony covered a period from 1890 on. Dr. Blain H. Sellers, of Indianapolis, Indiana, who attended the Indiana Dental College in 1891 and 1892, during the time Dr. Martin was an instructor and demonstrator of prosthetic dentistry, testified in corroboration of Dr. Martin. The witness was asked to describe the instruction he received in the casting of bridges and crowns, and replied: "Well, we first took the crown, made the crown to suit yourself, I always did, and then take a piece of wax and place that into the mouth and have the patient bite down onto that, and that would form the bite for the articulation, and then carve the wax any size and shape that we would want the cast itself to be. We would invest that in the plaster of paris, placing into the wax an instrument to act

as a sprue, after that part of the investment became hardened we added to that another on top, and after that had hardened we removed the two pieces separate, and then removed the wax from the mold, and we melt our gold and pour it into what we called the die, and then place the counter die on top of that, and the impression would form the cast bridge itself." Drs. Cravens and Bloor, both of Indianapolis, also testified in corroboration of Dr. Martin. Dr. Myron E. Le Galley, of Lafayette, Indiana, who was a student at the Indiana Dental College from 1892 to 1895, inclusive, testified in detail as to the instruction which he then received from Dr. Martin in the art of making cast bridges. The testimony of Dr. Le Galley is clear, and leaves no room for doubt that the process of the patent in suit, as applied to dental bridges, was fully explained to and understood by him during the time mentioned. It was stipulated that Dr. Clarence Williams, of Terre Haute, Indiana; Dr. W. H. Upjohn, of Lafayette, Indiana; Dr. Johnson and Minnie Howes, of Indianapolis, Indiana, if called as witnesses, would testify exactly the same as Dr. Le Galley as to the instruction received by them while in attendance at the Indiana Dental College through Dr. Martin, their attendance upon said school covering a period between 1889 and 1897. In addition to these several witnesses, Miss Martha Vories, who was Dr. Martin's assistant for about a year, commencing in 1897, testified to seeing Dr. Martin practise the process in issue. The testimony of this witness shows that she thoroughly understood the process at the time she saw Dr. Martin practise it.

Dr. Joseph Head, of Philadelphia, Pennsylvania, whose article on inlays is incorporated in the American Text-Book of Prosthetic Dentistry, who is a graduate of the Philadelphia Dental College, a graduate in medicine of the University of Pennsylvania, and a man evidently of wide experience and attainments, testified to the casting by him in the apparatus of Dr. Ball, which had been employed in making the Finley inlay, of a cast inlay. Dr. Head says: "I find that the material and apparatus that I employed, and which is stated to have been used by Dr. Ball, to be capable of producing an inlay as perfect as

any inlay I have ever seen." Dr. Head also produced a cast gold inlay which he had made by the use of the same investment compound and apparatus used by Dr. Simpson, and to which reference has been made. There is other corroborative testimony in the record, but we do not deem it necessary to review it.

Has the defense of prior use been made out? As no two cases are exactly alike, it is apparent that the character of the invention involved, the prior art, and the particular circumstances surrounding each case, must be considered in weighing evidence of prior use. The contention in this case that Dr. Taggart's discovery was revolutionary in character is not sustained. On the contrary, as appears from the record art at the time Dr. Taggart applied for his patent, dental castings produced by the lost wax process were well known. Having this in mind, there is nothing improbable about the testimony of appellant's witnesses. Indeed, Dr. Taggart himself, according to his own testimony, was in full possession of the idea involved in these claims more than ten years before he applied for his patent. The thing that most troubled him, and that deferred his patent application, was the production of a machine by which the gold could be quickly and easily forced into the mold after its completion; in other words, the process of producing such patterns and molds, generally speaking, was already well known. The real difficulty, therefore, was in producing a device that would quicken the practice of the process and thus induce the profession generally to make use of it. This is apparent from an examination of Dr. Taggart's bill in this case, wherein he states: "Your orator has expended large sums of money preparing for the market machines and apparatus with which the method of said patent can most readily and perfectly be practised, and is now prepared to supply the demand for such machines and apparatus." The doctor's testimony also shows, we think, that it was the production of these machines that consumed time, and not the evolution of the process.

The testimony which we have reviewed comes from witnesses whose standing is unchallenged in this record. Several of these witnesses are entirely disinterested. The cross-examination of

nearly all of them was confined to a few questions as to the character of the investment material employed, and considerable stress is laid in the brief because one of these witnesses, when recalled, failed to include in the formula then given an ingredient contained in his former answer to a similar question. We attach no importance whatever to this. In the patent itself Dr. Taggart conclusively disproves the contentions of his counsel that it required any special skill to evolve a formula for investment material, for he says: "The sprue former is then used as a handle to support the pattern, and the entire pattern is covered with a primary coating of investing material. *This investing material may be any one of the various dental investing materials on the market."* Moreover, the prior record art contained ample information concerning the investment feature of complainant's patent. The real question which we are called upon to determine from the evidence before us is whether the various dentists who have testified, or any of them, were in possession more than two years prior to the date of the original application for this patent, of the idea attempted to be covered thereby, and whether they, or any of them, gave expression of that idea in a practical and public way. It is of no possible consequence that, by the use of Dr. Taggart's machine, gold inlays and the like may be produced more cheaply and rapidly than they were produced by dentists who have testified. It is enough if those dentists took a wax impression in the manner described by these claims, and formed a mold around the pattern thus obtained, for the purpose of casting a dental inlay or the like. To hold that this was not done would be arbitrarily to disregard and set at naught the testimony of witnesses whose character and reputation are unimpeached, and whose testimony is reasonable and in entire harmony with the circumstances of this case. We are unwilling to assume such a position. We are fully persuaded that the evidence shows beyond a reasonable doubt that for many years prior to the filing of the original application herein, the process of making patterns and molds for dental inlays and the like, as expressed in these claims, had been publicly practised upon many occasions. This finding avoids

the patent, and renders it unnecessary to determine whether the
claims thereof were anticipated by the prior record art.

It follows that the decree must be reversed, with costs, and
the cause remanded with directions to dismiss the bill.

*Reversed and remanded.*