EVERLUBE CORPORATION OF AMERICA, Plaintiff,

v.

ELECTROFILM, Inc., and Joseph E. Droege, Defendants.

ELECTROFILM, Inc., Cross-Claimant,

v.

EVERLUBE CORPORATION OF AMERICA, A. R. Booker, and K. Taylor, Cross-Defendants.

No. 20315.

United States District Court
S. D. California,
Central Division.

July 29, 1957.

Harris, Kiech, Foster & Harris, Los Angeles, Cal., by Warren L. Kern and Walton E. Tinsley, Esq., Los Angeles, Cal., for plaintiff and cross-defendants.

Walter H. Young, and H. Calvin White, Esq., Los Angeles, Cal., for defendants and cross-claimant.

YANKWICH, District Judge.

By its complaint plaintiff seeks a declaratory judgment of invalidity and non-infringement of Patent No. 2,703,768, dated March 8, 1955, owned by the defendant (28 U.S.C.A. § 2201) and damages for unfair competition (28 U.S.C.A. § 1338(b))

The defendants in their Answer ask for a declaration of validity and by cross claim, charge infringement and unfair competition and ask injunctive relief and damages.

The patent in suit is denominated "Dry Lubrication Process and Product." The object of the invention is stated in the specifications in this manner:

"In accordance with my invention, graphite may be practically permanently bonded to the surface of the article being treated, and thus provide lubrication or protection for very long periods of time without any further treatment.

"One object of my invention is to provide processes for bonding graphite to the surfaces of articles whereby the graphite is retained at least semi-permanently in a position to produce lubrication.

"Another object of this invention is the production of articles with surfaces having substantial quantities of finely divided particles of graphite embedded impregnated or diffused therein as distinguished from a mere coating of loose graphite particles.

"A further object of this invention is to provide friction surfaces on articles with lubrication in the form of particles of graphite bonded and held securely thereto by means of a resinous bonding agent that is resistant to heat and pressure and that does not deteriorate in the presence of oils and other lubricants."

At the trial of the case, the issues were reduced to two: (1) validity of the patent and (2) infringement.

In determining the matter, it is well to consider generally the grounds of invalidity alleged in the complaint. The complaint, after alleging the claim of the plaintiff that the patent is invalid and the contrary contention of the defendants and their notice to the plaintiff that they are infringing, states generally that the Letters Patent and each of the claims thereof are invalid because

"(a) None of the alleged inventions or discoveries claimed in Letters Patent No. 2,703,768 were or are patentable to the alleged inventor named therein, under the provisions of Sections 101, 102 and 103 of Title 35 of the United States Code."

More specifically, it is stated that

"(b) All of the claims of Letters Patent No. 2,703,768 are invalid, because the alleged inventions or discoveries described thereby were patented or described in certain printed publications and Letters Patent in this and foreign countries before the alleged invention or discovery thereof by the applicant for said Letters Patent.

"(c) All the claims of Letters Patent No. 2,703,768 are invalid, because, prior to any supposed invention or discovery by the applicant for said Letters Patent, that which

is alleged to be patented by said Letters Patent, and particularly that which is described and claimed therein, and all material and substantial parts thereof, had been previously known to, and used by, others in this country."

We consider first the question whether the patent was anticipated in the prior patented art. (35 U.S.C.A. § 102(a))

## I

### The Process Patent Involved

The patent involved is a chemical process. The claims, while seven in number, are brief. They are reproduced in the margin.[1]

In substance, the claims, after describing the general character of surface pretreatment, refer to thermosetting polymerizable materials as vehicles for bonding the solid particles of the lubricant. In the specifications, the vehicle, which will contain the graphite, is described as containing a thermosetting bonding agent and they indicate the desirable properties of the resultant bond. Several thermosetting vehicles are referred to. The specifications also mention the fact that solvents are to be employed as thinners,—that is, they are to be used so as to permit thin coatings to be supplied.

Because the patent uses chemical terms, some of which have only recently come into general use, it is well to define three terms that are significant:

*Polymerisation:* The combination of several molecules to form a more complex molecule having the same empirical formula as the simpler ones. It is often a reversible process. (Chambers, Technical Dictionary, 1948, p. 662)

*Thermosetting compositions—(Plastics):* Compositions in which a chemical reaction takes place while they are being moulded under heat and pressure; the appearance and chemical and physical properties are entirely changed, and the product is resistant to further applications of heat (up to charring point); e. g. phenol formaldehyde, urea formaldehyde, aniline formaldehyde, glycerolphtalic anhydride. (Ibid, p. 846)

*Thermoplastic:* (Chem) Becoming plastic on being heated. Specifically (Plastics), any resin which can be melted by heat and then cooled, the process being able to be repeated any number of times without appreciable change in properties; e. g. cellulose derivatives, vinyl resins, polystrenes, polyamides, acrylic resins. (Ibid, p. 845) [2]

1. "I claim:

"1. A process for lubricating the surface of an element that is subjected in use to mechanical friction, that comprises treating the surface to form a large number of substantially microscopic irregularities therein, applying to the surface an abrasive-free coating mixture consisting essentially of liquid and a large number of finely divided solid lubricant particles, distributed within the liquid in a proportion sufficient for coating of substantially said entire surface by the particles, said liquid including an uncured thermosetting polymerizable resin bonding agent, and baking the coating to polymerize and harden the thermosetting resin and thereby tightly bond the solid lubricant particles in place on said irregularized surface, said coating having upon drying a thickness under $\frac{1}{1000}$ of an inch.

"2. A process as defined in claim 1, in which said solid lubricant includes graphite particles.

"3. A process as defined in claim 1, in which said solid lubricant includes molybdenum disulfide particles.

"4. A process as defined in claim 1, in which said surface irregularities are formed by phosphatizing of said surface.

"5. A process as defined in claim 1, in which said surface irregularities are formed by sandblasting said surface.

"6. A process as defined in claim 1, in which said coating mixture contains between about $\frac{3}{4}$ and $3\frac{1}{2}$ pounds of said solid lubricant particles per gallon of said liquid.

"7. An element having a surface that is subjected in use to mechanical friction and is coated with dry lubricant by the process defined in claim 1."

2. These definitions accord with those given in Webster's New International Dictionary, 2nd Ed. For definitions of terms thermosetting and thermoplastic see New Words Section, p. CXI. For

In substance, what Hall teaches is a method of producing a dry lubricating process and product by using a mixture which can be thermoset in place of other bonding agents, such as varnish or acid resin mixture. He specifies the bonding agent and describes steps which are to be taken to make the bond. The result, as testified to in the record, is a dry lubricant that stands a good deal of wear and can be used on airplanes and other intricate engines in places that cannot be reached by ordinary methods of lubrication.

■ In claims for processes, it is necessary that all the steps in the process be described. Walker on Patents, Deller's Edition, 1937, Vol. II, § 171, pp. 813–814; Application of Fahrni, 1954, 210 F.2d 302, 303–308, 41 C.C.P.A., Patents, 768. And when the process consists of old elements known in the art, then patentability exists only if, in the language of an old case, *the patentee has added something of value to the sum of human knowledge.* O'Rourke Engineering Construction Co. v. McMullen, 2 Cir., 1908, 160 F. 933, 938; and see, Application of Gibbons, 1954, 210 F.2d 299, 301, 41 C.C.P.A., Patents, 788. There has been no break in the continuity of the application of this test over the years. The more recent restatements by the Supreme Court have merely insisted that when applied to a combination of old elements, *it must be evident that there is a contribution to prior knowledge* before invention is found. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. As said by the Court in the case just cited:

"The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. *Elements may, of course especially in chemistry or electronics, take on some new quality*

definition of terms polymerize and polymerisation see p. 1912. The Webster definition of thermosetting more correct-

*or function from being brought into concert,* but this is not a usual result of uniting elements old in mechanics." (Emphasis added)

■ The Supreme Court recognizes that while in mechanics the uniting of old elements may not satisfy the concept of invention, because the elements may continue, in combination, to perform the same function as before, with no different result, this is not true in chemistry. This for the reason that a chemical element, in a different combination, may achieve a new quality or function.

This fact, the verity of which is obvious, is of great significance in a case of this character in which it is insisted that all the elements used to achieve the result are well known in chemistry, and that all that the patentee did was to urge their use in the particular combination. The brief analysis of the patent already given points to the fact which the patentee admits, that, while graphite had been known for many years as a successful dry lubricant, and had been used for that purpose in combination with other elements, the difficulty, as the patentee described it, was that

"dry graphite as ordinarily used, adheres to a friction surface for only a limited time and frequently requires replacement."

Experimenting over a long period of years, the inventor, *a practical journeyman painter,* seems to have succeeded in evolving a dry lubricating process which has the element of durability lacking before in such lubricants, as disclosed in the patented art. In his process, he describes the various steps to follow, which, in brief, are: (1) treating the surface to form a large number of substantially microscopic irregularities; (2) applying to it an abrasive-free coating mixture consisting of liquid and a large number of finely divided solid lubricant particles distributed within the liquid in a proportion sufficient for coating of substantially the entire surface by the particles;

ly gives that designation to "becoming permanently rigid by *application of heat*".

(3) the liquid to include uncured thermosetting polymerizable resin bonding agent, and (4) baking the coating to polymerize and harden the thermosetting resin so as to form a tight bond in place, the coating having upon drying a thickness of less than 1/1000th of an inch. This process is summarized in Claim 1. In the other claims, he indicates the use of graphite (Claim 2) and molybdenum disulphide particles (Claim 3), and the method of securing the surface irregularities by phosphatizing or sand-blasting. (Claims 4 and 5) He recommends definite proportions of the solid and liquid components in order to obtain best results, (Claim 6) and finally claims the element having the surface so treated. (Claim 7)

The novelty of the result is attested to by the commercial success of the venture and the attempt of the plaintiff to have the patent invalidated so that they may, with impunity, infringe it. This is made clear by an analysis of the best references in the patented prior art which plaintiff claims to be anticipatory.

## II

### The Best Prior Art

We begin with the patent to Thompson, No. 1,481,936, dated January 29, 1924. The inventor calls his patent "Process of Applying Graphite to Engine Pistons and Cylinders", which he describes more specifically as

"* * * a process of applying an adherent coating of highly comminuted graphite of the co-ordinating surfaces of engine-cylinders and their pistons with the objects of diminishing friction and largely, or even wholly preventing them from scoring and seizing."

He does not describe any method of surface pre-treatment. Nor does he call the water medium of the original graphite suspension a bonding agent. It actually is such, as is evidenced by his description of the unsatisfactory results of using oil as the suspending medium.

The German Patent to Bergl No. 466104, dated September 29, 1928, is en-

titled "Lubricant for body surfaces moved upon each other". All Bergl claims is:

"1. Lubricant for body surfaces moving upon each other, characterized in that solid smoothing substances such as graphite, talc and the like are contained in dispersed form in drying dispersion agents forming a solid film."

In his specifications he states:

"* * * the dispersion agent according to the invention consists of a liquid that hardens to a film and forms a firm coating * * *"

i. e., hardens upon evaporation of volatile constituents as in the case of varnishes. Here the lubricant coating as a whole is similar to a paint, the particles of solid lubricant being substituted for the particles of pigment. When the "paint" dries or hardens, the coating is ready for use. Some varnishes contain drying oils which react chemically with the oxygen of the air to effect a hardening of the coating. In some cases, this hardening could be effected through an actual polymerisation of the vehicle catalyzed,—in a sense, by the drying oil or similar constituent. While the application of heat to the work would speed up the drying or hardening process, the description in the patent cannot be said to cover thermosetting resins or similar formulations.

The other German Patent, Greth No. 741,087, dated November 4, 1943, relates to lubricating varnish. The claim is limited to

"Lubricating varnish consisting of graphite or carbon modifications similar to graphite, synthetic resin and, if need be, organic solvents, characterized in that condensation resins of the type of phenol and amine resins are used which are obtained by means of monoalcohols with simultaneous or subsequent distilling off of the alcohol in question, if need be in the presence of or with subsequent addition of softening or other oil or resinous substances."

An analysis of this patent shows that, although synthetic resins are suggested as suitable vehicles, the cases described employ solvents as such, i. e., the basic character of the resin, chemically, is not altered by evaporation of the solvent. In the claim, the purely solvent action of monoalcohols ·is used as an example. The use of the words "burnt in" *(eingebrannt)* is claimed by the plaintiff to indicate a baking similar to one of the steps in the Hall process. "Burning in" might mean a necessary oxidation step carried out after the solvent had been evaporated or distilled off. However, in the context employed, it is evident that "burning in" is merely a step employed to remove the last trace of solvent from the coating. It may well be that some chemical reaction takes place upon such "burning in". But this is apparently *not* the principal aim of the step described in the patent.

In the patent to Bramberry, No. 2534406, issued on December 19, 1950, upon an application filed September 22, 1944, long before the earliest Hall application (which was dated April 13, 1946), and which plaintiff claims it is using in its process, resin is mentioned as a binder. But nearly every mention of it is followed by mention of a solvent for it. This is an indication of the chemical inertness of the resin so far as possible thermosetting character is concerned. In Column 5, lines 58–69 of the patent, a statement is made to the effect that the high temperatures which may be employed are for the purpose of hastening the action of the spraying compound. The composition of the spraying compound (Col. 5, Lines 37–48) is such as to permit the following conclusions: Resin is accompanied by a solvent which permits one to apply the whole compound more easily. The phosphoric acid must be present in order to yield a metal phosphate deposit on the surface of the work (as in phosphatizing and related processes). Therefore, the action, which is to be speeded by heating, is a combination of solvent evaporation and reaction of the phosphoric acid with the metal.

Phenol-formaldehyde resin is mentioned specifically. But the state of the resin is not mentioned and a solvent for it is included in the formulation of the spraying compound. This suggests that the resin is already in its polymerized state. It could not, therefore, be thermoset. And the fact that this patent teaches baking at high temperatures does not go counter to this conclusion.

In summary, Hall employs a mixture which can be thermoset in place of other bonding agents such as varnish, or an acid-resin mixture. He is specific about the bonding agent and the steps which are to be taken to make the bond. The others are not. He has described in detail the various steps of the process. ·The others have not. He achieves a result which they do not.

In the field of chemistry, it is often difficult to anticipate results,—especially when dealing with catalyst action. Walker on Patents, Deller Ed., 1937, Vol. 1, § 25, pp. 131–135; Corona Cord Tire Co. v. Dovan Chemical Corp., 1928, 276 U.S. 358, 368–369, 48 S.Ct. 380, 72 L.Ed. 610.

At times, what might seem a slight deviation from the prior art may result in an important discovery. Illustrative is the aspirin case where validity over the prior art was found, although the only difference was one of purification achieved by recrystallization in dry chloroform of acetyl salicylic acid:

"Hoffmann has produced a medicine indisputably beneficial to mankind—something new in a useful art, such as our patent policy was intended to promote. Kraut and his contemporaries, on the other hand, had produced only, at best, a chemical compound in an impure state. And it makes no difference, so far as patentability is concerned, that the medicine thus produced is lifted out of a mass that contained, chemically, the compound; for, though the difference between Hoffmann and Kraut be one of purification only—strictly marking the line, however, where the one is therapeutically available and the others were therapeutically un-

available—patentability would follow. In the one case the mass is made to yield something to the useful arts; in the other case what is yielded is chiefly interesting as a fact in chemical learning." Kuehmsted v. Farbenfabriken of Elberfeld Co., 7 Cir., 1910, 179 F. 701, 705.

A more recent illustration is a case in which the improvement in a lacquer consisted chiefly in the use of a particular type of resin in its composition. Ruling that this was invention over the prior art, the Court said:

"We must assume that Weber's synthetic resin did come from Arsem's patent, but there are very many natural resins and many synthetic resins and out of this great number Weber had to pick and did pick the suitable resin. It is true that it was a 'hard' resin. Arsem so described it. It is equally true that the art had supposed that hard resins would give hard lacquer, but as the chemists employed by Atlas pointed out and as the art knew, the harder the resin the less the compatibility with nitrocellulose. In the light of the foregoing we think that Weber did demonstrate inventive genius, that he seized upon a thing which was available to all but which had been grasped by none, and was able to fit it into a new place, to create an original and useful result." Gilbert Spruance Co. v. Ellis-Foster Co., 3 Cir., 1940, 114 F.2d 771, 773.

Hall, by the use of thermosetting binding, has taught the art something new. More, he has achieved better results. As stated before, it is quite apparent that the lubricating method Hall developed has durability which other solid lubricants described in the patented art did not have. One method of achieving it was through the use of the resin and the baking at high temperatures which results in the complete solidification and adherence of the mass to the metal surface. This is aided by the preparation of the metal surface by causing on it microscopic irregularities in which the mixture becomes embedded, and when solidified, serves as an added bond, and, —as I stated at the trial,—"anchors" the mass further. The other steps in the process aid in achieving the solid, lasting bond for the lubricant.

In sum, the admitted advantages of Hall are: (a) Better adherence; (b) Stronger and harder film; (c) Insolubility; and (d) Long durability. So, in both method and result, there is invention over what *the patented prior art discloses.* Such invention is "new and useful" (35 U.S.C.A. § 101) and "the differences between [it and the prior art are such that] the subject matter as a whole" *would not have* "been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C.A. § 103; and see, Pacific Contact Laboratories v. Solex Laboratories, 9 Cir., 1954, 209 F.2d 529, 533–534; Plax Corporation v. Precision Extruders, 3 Cir., 1957, 239 F.2d 792, 794–795.

One additional observation should be made.

In what precedes, we have examined the best references with the view of pointing out the presence of elements in the patent before us not present there. Much other prior art was offered, including a later Bramberry patent No. 2,534,-408, dated December 19, 1950, for which application was filed October 17, 1947, and relating to "relieved and filled cylinder surface". No useful purpose will be served by analyzing it and the other pleaded prior art in detail. We are convinced that they *do not anticipate* the Hall combination.[3]

3. During the course of the trial the defendants introduced as their "Exhibit W" an analysis by one of their experts of the elements disclosed by the various patents cited as anticipatory as compared with the Hall patent. While what is said in the text is sufficient to indicate the contribution of Hall to the art, the chart, a photostat of which is attached, shows, in my view, correctly the differentiations between the teachings of Hall and what the prior patented art taught. *(See pages 796–797 for chart.)*

## III

### Prior Knowledge and Art

 As already appears, the Complaint also alleged that the patent was invalid under the provision of the patent statute which reads:

"(a) the invention was known or used by others in this country or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent * * *." (35 U.S.C.A. § 102(a))

This provision is old in our patent law. In fact, it was a part of the first Patent Act of 1790, which authorized the granting of a patent to any person or persons who made an invention "not before known or used". Act of April 10, 1790, § 6, 1 Stat. 109. And see, Electric Storage Battery Co. v. Shimadzu, 1939, 307 U.S. 5, 10–12, 613, 616, 59 S.Ct. 675, 83 L.Ed. 1071.

Since its enactment, the Section has been interpreted as rendering a patent void if the art it taught was reduced to practice by others or known to others whether *the claimed inventor had such knowledge or not.* Indeed, Chief Justice Marshall, in a noted old case, stated this principle in a very effective manner:

"Without a critical inquiry into the accuracy with which the term invention or discovery may be applied to any other than the first inventor, the court considers this question as completely decided by the 6th section of the general patent act. That declares that if the thing was not originally discovered by the patentee, but had been in use, or had been described in some public work, anterior to the supposed discovery of the patentee, judgment shall be rendered for the defendant, and the patent declared void. Admitting the words 'originally discovered' to be explained or limited by the subsequent words, still, *if the thing had been in use, or had been described in a public work, anterior to the supposed discovery, the patent is void. It may be, that the patentee had no knowl-edge of this previous use or previous description; still, his patent is void; the law supposes he may have known it; and the charge of the judge which must be taken as applicable to the testimony, goes no further than the law."* Evans v. Eaton, 1818, 3 Wheat. 454, 513–514, 4 L.Ed. 433. (Emphasis added)

There has been continuity in this interpretation of the section. See, Mills v. Watson, 1955, 96 U.S.App.D.C. 43, 223 F.2d 335; Stearns v. Tinker & Rasor, 9 Cir., 1955, 220 F.2d 49, 56. And as the Court stated in the case last cited:

"An invention is 'known' as that word is used in the statute, when it is 'reduced to practice'."

Reduction to commercial use is not necessary. See, Corona Cord Tire Co. v. Dovan Chemical Corp., 1928, 276 U.S. 358, 384–385, 48 S.Ct. 380, 72 L.Ed. 610; Rosaire v. Baroid Sales Division Nat. Lead Co., 5 Cir., 1955, 218 F.2d 72, 74–75. Even if we apply the stricter tests of (a) formulation and (b) testing, they are present here, (Blicke v. Treves, C.C. P.A., 1957, 241 F.2d 718, 719–720) as will appear from the succeeding analysis of the testimony on the subject.

We consider the evidence in the record relating to prior knowledge and use by Acheson Colloids Company, which consists entirely of depositions.

Acheson Colloids Company is a division of Acheson Industries, Inc., which is the parent company. They are engaged in a number of operations which relate to disintegrating, dispersing and stabilizing graphite in colloidal dispersions. Acheson Colloids Company is the manufacturing unit which manufactures colloidal dispersions of solids in fluids and semi-fluids. Under several different names they have engaged in this business since 1908 at Fort Huron, Michigan. Its Vice-President, Morris W. Reynolds, who had been with the Company since 1926, and had been Vice-President for several years, stated the nature of the commercial use of colloids in this manner:

" * * * These dispersions are employed for their fundamental

Clerk, U.S. District Court, Sou. Dist. of Calif. Deputy Clerk
EXHIBIT
No. IDENTIFICATION
Date IN EVIDENCE
Date

Case No. 2625
Evertube vs. Electrofilm
DLW Exhibit W — IDENTIFICATION
Date JAN 13 1957
Date JUN 13 1957 — IN EVIDENCE
Clerk, U.S. District Court, Sou. Dist. of Calif.
Deputy Clerk

| AUTHOR AND TITLE OF PATENT OR ARTICLE | LUBRICATIONS OF SURFACES OF FRICTION ELEMENTS | REDUCING SURFACES TO FINE FINISH / APPLY TO SURFACE | REDUCING SURFACES TO SURFACES FREE OF IRREGULARITIES | PARTICLE SIZE | LIQUID CONCENTRATION SUFFICIENT TO COVER ENTIRE SURFACE | RESIN / SOLID INCLUDES LUBRICATING | BAKING | THERMOSETTING | FILM LESS THAN 1/100,000 OF AN INCH |
|---|---|---|---|---|---|---|---|---|---|
| MICKLE, BRITISH 11349, 4-20-1895, MINIMIZING FRICTION AND NEUTRALIZING EFFECTS, etc | NO | NO | NO | | NO | | NO | | NO |
| WESCOTT, 1,034,174, 7-30-12 METHOD OF TREATING IRON OR STEEL ARTICLES | NO | NO | NO | | NO | | NO | | NO |
| BAEKELAND, 1,054,265, 2-25-1913, ANTIFRICTION DEVICE (SOLID BEARINGS) | NO | NO | NO | | NO | NO | | | NO |
| ALLEN, 1,280,939, 10-8-1918 METAL POLISH | | NO | NO | | NO | NO | NO | | NO |
| THOMSON, 1,481,936, 1-29-1924, PROCESS OF APPLYING GRAPHITE TO ENGINE PISTONS, etc | | NO | NO | | | | | | |
| BERGL, DR 466104, LUBRICANT FOR BODY SURFACES MOVED UPON, etc 11-18-1925 | NO | NO | NO | | NO | NO | NO | | NO |
| McLINTOCK, BRITISH 474252, A METHOD OF TREATING THE CYLINDERS, PISTONS, etc, 10-28-1937 | | NO | NO | | NO | NO | | | NO |
| ALUMINIUM COLORS INC, BRITISH 492345, 9-15-1938 IMPROVEMENTS IN OR RELATING TO PISTONS | NO | NO | NO | | NO | NO | NO | | NO |
| SCHELLENGER, 2 066,113, 1-19-37 RESISTANCE ELEMENTS | | NO | NO | | | | | | NO |
| BLOOMENTHAL, 2,085,413, 6-29-37, CARBON COATED CONTAINER FOR ELECTROLYTIC, etc | NO | NO | NO | | | | | | NO |
| COOPER, 2,156,803, 5-2-39, LUBRICANT | | NO | NO | | NO | | NO | | NO |
| CARSON, 2 111,167, 3-15-38 GUN CARTRIDGE | | NO | NO | | NO | | NO | | NO |
| WORM, 2,157,155, 5-9-39, TREATING ALUMINUM SURFACES | | NO | NO | | NO | | NO | | NO |

| Metallic element and method | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| KOEHRING, 2,187,066, METALLIC ELEMENT AND METHOD OF MAKING SAME 1-16-40 | | | | | | | | | |
| STUART, 2,196,128, 4-2-40, COATING AND IMPREGNATING COMPOSITION etc | NO | NO | NO | NO | NO | NO | | NO | NO |
| RANEY, 2,270,662, COATED STEEL ARTICLE 1-20-42 | NO | NO | NO | NO | | NO | | NO | NO |
| BECKER, DR 710,866, 4-9-35, ENGINE PART OF INTERNAL COMBUSTION etc | | NO | NO | NO | | NO | | NO | NO |
| WILKEY, 2,284,785 6-2-42, FRICTIONAL MATERIAL AND METHOD OF MAKING etc | | NO | NO | NO | NO | NO | | NO | NO |
| MAHLE, SWISS 220,565 7-1-40, PROCESS FOR A SELF LUBRICATING COATING ON etc | | NO | NO | | | NO | | NO | NO |
| SIEBEL, 2,330,635, 9-28-43, MACHINE PART SUBJECT TO SLIDING STRESS | NO | NO | NO | NO | | | | NO | NO |
| GREIM, DR 741,087, 9-17-39, LUBRICATING VARNISH | | NO | NO | | | | | NO | NO |
| PARKER, 2,335,958, 12-7-43 SEALING AND ANTISEIZE COMPOSITION AND etc | | NO | NO | NO | | NO | | NO | NO |
| KAECHER 2,367,946, 1-23-45 PROCESS OF PRODUCING METALLIC DISULPHIDES etc | NO | NO | NO | NO | NO | NO | | NO | NO |
| KOCH, 750,245; 11-16-40, PROCESS FOR APPLICATION OF AN AUXILIARY BEARING etc | | NO | NO | | | NO | | NO | NO |
| MENNING 2 365, 718; 9 25-45 SHUTTLE | | NO | NO | | | NO | | NO | NO |
| BRAMBERRY 2,470,136, 5-17-49 COMPOSITION FOR TREATING METALLIC WEAR SURFACES | | NO | NO | | | NO | | | |
| BRAMBERRY 2 534,406 12-19-50 COATED METAL ARTICLE AND METHOD OF etc | | NO | NO | | | NO | | | |
| BRAMBERRY 2,534 408 12-19 50 RELIEVED AND FILLED CYLINDER SURFACE | | NO | NO | | | NOT PRIOR TO HALL | | | |
| MAHLE, "SLIDING SURFACE PROTECTION(NO DETAILS-MERELY BOOSTS) | | NO | NO | | | NO | | NO | NO |
| ENGLISCH, "SURFACE TREATMENT OF PISTONS" | | NO | NO | | | | | NO | NO |
| SCHWARTZ, OF MAHLE'S LABORATORY)ON THE PROCESSES FOR PROTECTING LIGHT etc | | NO | NO | | | NO | | NO | NO |
| BANELITE SALES DEPT BROCHURE ON BAKELITE VARNISH | NO | NO | NO | NO | NO | NO | | NO | NO |

properties involving lubrication, electrical conductivity and color. They are particularly used in the form of fluid dispersions, dispersions which form dry-film coatings for surfaces requiring lubrication and in the field of photography and allied businesses and an opaque for shutting out light. They have wide utility in the field of electronics."

In the dry-film lubrication field, the liquids used were water, petroleum oil and other petroleum products, resins and alcohols. The resins used were thermosetting resins. At the present time, the dry lubricant materials dispersed in these resins are graphite, molybdenum disulfide, talc and zinc oxide. The sales of these formulations have been continuous since 1934, the thermosetting resins being identified in their catalog by several numbers. Three of them—Nos. 35, 38 and 47,—have been used since 1941. Prior to that time and between the years 1934 and 1941, the Company's predecessor sold a thermosetting resin under the name of "Varnodag". Its sale was continuous during those years and the description of the product was "colloidal graphite dispersed in phenolformaldehyde resins". A brochure of the Company, published in 1934, listed the product, the brochure being distributed to customers, prospective customers, all field sales personnel, institutions of higher learning and to trade journals "if they approved".

The product was registered as Trademark Registration No. 32858 in which the date of first use was given as May 10, 1934. A technical bulletin, No. 230.1, was copyrighted June 7, 1934. Other bulletins copyrighted at a later date are in the record. In one of them, the product was described in this manner:

"'Varnodag' Colloidal Graphite (in varnish) Electric-furnace graphite can be obtained colloidally dispersed in phenolformaldehyde varnish. This material serves as a lubricating paint, high resistance element, and protective coating."

The Company's field representatives informed prospective customers as to the material, its composition, its recommended use and method of using it. There is in evidence in a memorandum written by one of Reynold's subalterns in charge of the sales engineering laboratories, E. F. Heer, dated June, 1940, recommending the use of the product to General Electric Appliance Company and reporting such recommendation to Reynolds. The latter company submitted parts for experimentation and treatment. They were treated as the brochures recommended and sent back to General Electric Appliance Company. The dispersions numbered 35, 38 and 47, containing thermosetting resins, alkyd resins, in which is dispersed a lubricating solid graphite, have been sold continuously since 1941 to the present time. The representatives in the field recommended baking as a means of applying the resin. Cards were offered in evidence to identify the customer to whom these dispersions were sold. Many of them contained directions as to baking for an hour at 300–350 degrees Fahrenheit. The witness described the method of application which was recommended and which was followed, by stating that the parts were first

" * * * thoroughly cleaned by what some people called degreasing or otherwise using other methods such as mild acid etch, sand blasting or the methods found favorable to the contractor in question who was assembling the bomb fuse gears. Following that the parts were usually mounted on a suitable device to apply the coating in question."

The coating was applied to the part either by dipping it in the material, by brushing the material on the parts or by spraying it on the part.

The witness described the process he saw used at the Process Engineering Company in Chicago between 1943 and 1944, as consisting of (a) dipping the part (a copper part) into a mild acid bath which is called a mild acid etch, following which (b) the part was mounted on a spindle, which spindle was mounted on a turntable around which at stated intervals of arc there were (c) several spray guns placed. The turntable carried the

parts around in a circle past the spray guns and through a method of trip mechanism, (d) the spray was impinged upon the part. Following that, the part was put through a baking oven at a controlled temperature.

Dr. Harold J. Dawe, Research Director for Acheson Industries, Inc., supplied additional details. A graduate in chemistry in 1932, he did special work in colloid chemistry and received a PhD in June, 1940. He developed the dispersions "Dag" 35, 38 and 47, which consisted of combinations of graphite, alkyd resins and aromatic petroleum naphthas, solvents. The resins used ("Beckosol") are thermosetting and polymerizable. A photographic copy of his laboratory notebooks showed long-hand entries from October 30, 1941, to July 20, 1942, giving the various stages in the development of these dispersions.

Alden Crankshaw, who started with the Company March 21, 1932, and, at present, is Sales Manager of Acheson Colloids, testified to the large sales of the dispersions for use as lubricants and identified numbers 35, 38, 47, 212 and 223 as being dry-film lubricants dispersed in a thermosetting resin after "Varnodag" was discontinued.

Among their customers was Bell Telephone Laboratories to whom the dispersions were recommended as dry-film lubricants. The use of the products 35, 38 and 47 grew after they were adopted during the war as dry-film lubricants on the gears of bomb fuses in bombers used for high altitude bombing. Because of the high altitude, the nature of the gears and the temperature encountered by the bombers, no liquid lubricant "could stand up". The witness sold these products to at least ten companies engaged in manufacturing such gears. And there is evidence of sales to others.

In 1944, the witness saw the manner in which it was applied. The materials were (a) diluted in the ratio of one part of the product to four parts of solvent, and (b) the resultant mixture was sometimes sprayed and more frequently the coating was applied by (c) dipping the parts, either pre-heated or cold, and then (d) baked afterwards as a rule to 300 degrees Fahrenheit.

After the conclusion of the war, the sales continued in large quantities. Many of the concerns which had had experience with the dispersions while making bomb gears, continued to use them as dry lubricants in their regular peacetime products. In fact, the company added dispersions 213 and 223 in an epoxy resin and 232 which, like 35, 38 and 47, was an alkyd resin.

Percy C. Buck, Vice-President of Acheson Industries, Inc., and who was General Superintendent in charge of production in 1932, related other experiments with thermosetting resins during the period testified to by the other witnesses.

From the testimony of these witnesses and the exhibits, the conclusion is warranted that the method of application corresponds to the various steps of the Hall patent: (1) irregularization of the part by a bright acid dip; (2) the spraying of the material with (3) a thermosetting resin containing graphite followed by (4) the baking.

It is quite evident from the depositions, the testimony of the witnesses, the contemporaneous memorials of the acts done and the nature of the parts to which the dispersions were applied, that the thickness of the film, corresponded to that taught by Hall. So that prior use and knowledge under Subdivision (a) of Section 102, 35 U.S.C.A., as that Section has been historically interpreted in the cases referred to at the beginning of this subdivision of the Opinion, are established.

### IV

#### Public Use

The plaintiffs have also urged invalidity by reason of prior public use more than one year prior to the date of the application for the patent under Subdivision (b) of Section 102 of Title 35 U.S. C.A. Older cases have held that evidence under such an attack should be "clear, satisfactory and beyond a reasonable doubt". Barbed Wire Patent (Wash-

burn & Moen Mfg. Co. v. Beat'Em All Barbed-Wire Co.), 1892, 143 U.S. 275, 284, 12 S.Ct. 443, 447, 36 L.Ed. 154. However, later cases have departed from this rigid formula and have practically eliminated the words "beyond a reasonable doubt". They say now that the proof must be "more than a dubious preponderance—it must be strong, clear and convincing". Insul-Wool Insulation Corp. v. Home Insulation, Inc., 10 Cir., 1949, 176 F.2d 502, 505. Or, as another case puts it, "as between two inventors priority of invention will be awarded to the one who, by *satisfying proof,* can show that he first conceived of the invention". Marconi Wireless Telegraph Co. of America v. United States, 1943, 320 U.S. 1, 34, 63 S.Ct. 1393, 1409, 87 L.Ed. 1731. (Emphasis added). And see, Radio Corporation of America v. Radio Engineering Laboratories, Inc., 1934, 293 U.S. 1, 7–8, 55 S.Ct. 928, 79 L.Ed. 163; Oxnard Canners v. Bradley, 9 Cir., 1952, 194 F.2d 655, 658–659.

In applying this rule, the courts have not set before the trier of facts the impossible task of *requiring perfect demonstration.* The Court of Appeals for the Ninth Circuit has stated the rule and its implications in this manner:

"The burden of proof imposed upon a party tendering the issue of prior public use is a heavy one. It is not satisfied by a mere preponderance of the evidence, but is borne successfully only if the evidence is clear and satisfactory—perhaps beyond a reasonable doubt. It is not the rule, however, that oral evidence is insufficient as a matter of law in all cases; nor does the rule require the trial court to discard credible testimony merely because it is oral and because it deals with events and circumstances long past. *If the evidence as to prior public use is such that it would be accepted as satisfactory and convincing in any other kind of case, criminal or civil, then the degree of proof fixed by law to establish such use is attained."* Whiteman v. Mathews, 9 Cir., 1954, 216 F.2d 712, 716. (Emphasis added)

The evidence on this issue relates to the process used at Bell Telephone Laboratories at New York City and Western Electric Company at Chicago, beginning in 1934. The men in the Research Department of Bell began doing research on and reduced to practice dry lubricating finishing in order to solve—as one of the witnesses, Robert Burns, put it—"a specific apparatus problem", which, again quoting him,

"was one of making a piece of apparatus work which didn't work before. It didn't work before because of chattering and lack of a smooth enough finish between two contacting metal parts."

Burns is not a chemist. He invented a composition which took ordinary black japan which they used at Western Electric Company for painting telephones, to which he added a standard flake-type of graphite. He mixed them, added a solvent and after cleaning the metal parts in the usual fashion, applied the finish, air-dried it and baked it. To secure the proper dimensional tolerances, he burnished the excess off the surface, leaving only an extremely thin layer of graphite. Specifications were prepared relating both to the change in apparatus and to the finish. One such specification dated February 11, 1936, is entitled "Baked Lubricating Finish". Its use is described in this manner:

"This specification covers a baked lubricating finish which may be applied to any base material normally suitable for the application of baked japan. It is used to impart low-friction characteristics to rubbing surfaces and requires no further attention during the life of the apparatus."

Because of their relation through common ownership,—Bell Telephone Laboratories, the parent organization, devoting its efforts to research, while the Western Electric Company, a manufacturing subsidiary, manufacturers of components of telephone equipment,—these specifications stated:

"This finish corresponds to the Western Electric Company's No. 495 finish and is to be called for by the

Western Electric Company's code number."

In this specification, the material is referred to as "the baked lubricating finish." For surface preparations several methods are given, among them (b) *scratchedbrushed* and (c) *sandpapered.* Baking in an oven at 375 to 400 degrees Fahrenheit for one hour is directed.

Burns filed an application for patent on March 26, 1936, which he did not complete because a finding by the Examiner held that it was not patentable over the prior art. However, the invention was never abandoned to the public, (35 U.S. C.A. § 102(g)) but, in modified form, has been in continuous use at Western Electric since, as will be evident in what follows.

Wilfred E. Campbell, employed by the Company at about the same time, is a physical chemist with a PhD degree and with long experience both in teaching and in practicing physical chemistry beginning in South Africa and ending with a long experience in this country since 1926. In 1935, he was employed by Bell on several projects relating to lubrication and tarnishing of metals. He, like Burns, in 1934 and 1935, began to work on solid lubricant coatings, in order to reduce the friction between rubbing parts,—steel parts,—in rubbing contact. The problem called for solid coatings because these parts were used in telephone apparatus where the creepage of oils would be unsatisfactory to adjacent apparatus. So, as he put it, "We went into this solid lubricant program."

The specific program arose during the development of a new switching system called "the cross bar switching system". One of the components of this system consisted of a moving thin finger which was a thin steel wire and this finger was in contact with another metal surface and had to move back and forth over the surface. The tendency was to stick and to give a chattering type of operation which affected the smooth operation of the switch. It was, therefore, decided to lower the friction of the finger and the surface with which it was in contact. It was imperative that whatever lower fric-

tion film was put on should last as long as the apparatus. As this was a matter of emergency, Campbell's research department and other departments were called into consultation to determine the action to be taken. After trying various compounds, such as stove polish, graphite and waxes, which had lower life, they turned to the material known as "Varnodag", made by the Acheson Colloids Company. After using it, Campbell came to the conclusion that the formulation should be changed. He asked Acheson Colloids to provide him with a similar composition with the same binder, but with a higher percentage of colloidal graphite. Unable to secure it from them, they decided upon their own composition. They secured what Campbell refers to as "the finest graphite we thought we could get then, which wasn't colloidal", and decided to disperse it in resin binders, and then went to the resin experts,—fellow scientists in the Research Department,—Roy Erickson and Walter Clarke. They tested the component, as Burns had not done, and found that a composition made with a resin known as alkyd resin,—a thermosetting resin, with graphite in it,—gave the most lasting result. A resin sold under the trade name "Beckosol" was used. To it was added an equal amount of graphite by weight. Ultimately, they used one part graphite and one part resin. Then the mixture was diluted with one part solvent. The thicknesses tested were between one-half of 1/1000th to 1/1000th of an inch. In applying it, the surface was cleaned with carbon tetrachloride degreasing or by solvent treating. After an abrasive cleaning, the mixture was applied and baked. This process was arrived at after long consultation with men from other departments including Burns. Tests were made to compare the two compositions and the decision was in favor of that evolved by Campbell as having the more lasting qualities.

On January 3, 1938, Bell issued its first specification embodying this method, which was used in preparing parts for Western Electric. The original specification is in the record, as is also a revision dated August 9, 1943. These

specifications describe the materials to be used, the method of application, the preparation of the surface and the subsequent baking.

Corroborating testimony as to these matters was given by Arthur M. Wagner, chemical engineer in charge of inorganic finishing at Western Electric and the formulation of specifications for dry-film lubrication in 1937 and 1938, and the supervision of their application. As to another witness, Morris Brown, who worked with him, and who became Department Chief of the finishing group in 1939, a position he occupied until May, 1942, it was stipulated that he

"* * * if asked about witnessing the application of finishes compounded of black japan and graphite, and their application on parts made here at Western Electric, would testify * * * in the same manner and to the same effect."

Contemporaneous interoffice communications were received in evidence showing the consultations, conferences and discussions with other department chiefs concerning these matters and the progress made.

A sprayer, Thorliff Thovesen, who was examined by deposition at Los Angeles, while the trial was in progress, testified that, working at Western Electric at Hawthorne Station, Chicago, Illinois, between 1937 and 1941, he applied this material on an average of one thousand times a month. Corroborating this testimony is a photostatic copy of a specification from which he worked and on which he *identified the surface* in the apparatus to which the applications were made (the only portion admitted into the record). His testimony and the testimony of others show that the process has been in continuous use by Western Electric since, and that Acheson Colloids continued to sell the dispersions with directions to apply them in a manner similar to the *method described in the Hall* patent.

This testimony stands uncontradicted. The fact that Burns, who is not a chemist, and who incorrectly designated material as thermosetting, is of little, if any, significance. He is entitled to the full scope of his process, whether he envisaged all its consequences or not. See, Radio Corporation of America v. Radio Engineering Laboratories, Inc., 1934, 293 U.S. 1, 14, 55 S.Ct. 928, 79 L.Ed. 163; Werner v. Watson, D.C.D.C., 1955, 128 F.Supp. 471, 472. And under this defense—as under the other—what we must determine is whether the teachings of the Hall patent *were* in public use by others. The evidence from Bell and Western Electric, supported by contemporaneous documents, stands uncontradicted in this respect. Counsel for the defendants were present at the various depositions and subjected the witnesses to searching cross-examinations, which, in our opinion, did not affect the conclusion that the Bell and Western Electric process, *in public use since 1938,* and *still in use,* embodies the essential features of the Hall patent. For we have here the essential four steps in the application of the Hall process; (a) Preparation of surface (by abrasion or roughing); (b) Application of a thin coat of thermosetting material; (c) Resin containing graphite as solvent; and (d) Baking at high temperature,—all applied to secure a durable dry-film lubricant. And the evidence of the defendants, including the comparative physical exhibits prepared and offered to show the contrary, do not, in my view, command a different conclusion.

To continue the analysis:

Hall gives more minute details as to the various steps in the process than appear in the Bell-Western Electric specifications, chief among which are the preparation of the surface so as to produce microscopic irregularities and the baking at high temperatures. These deviations, giving them full scope, do not destroy or weaken the proof of prior public use of the teachings of the patent by Bell-Western Electric. The more thorough preparation of the surface area by Hall, *the importance of which was stressed so much at the oral argument,* is merely a matter of degree. And it is significant

that one of the current specifications (Gilfillan), which was introduced into the record by the defendant *to show infringement,* specifies "bright dip or similar treatment" when the process is to be applied to "copper or alloys unplated". This is identical with the Bell-Western Electric practice on similar materials. So, if the charge of infringement by performing work under these specifications be true, are we not, in order to be consistent, compelled to apply to the situation the old truism in the law of patent that

"That which infringes, if later, would anticipate, if earlier".

See, Peters v. Active Mfg. Co., C.C.Ohio 1884, 21 F. 319–321; Peters v. Active Mfg. Co., 1889, 129 U.S. 530, 537, 9 S.Ct. 389, 32 L.Ed. 738; Knapp v. Morss, 1893, 150 U.S. 221, 228, 14 S.Ct. 81, 37 L.Ed. 1059; Perfect Circle Co. v. Hastings Mfg. Co., 6 Cir., 1937, 88 F.2d 813, 816.

More, the temperature mentioned by Hall is, in substance, the baking temperature at Bell-Western Electric. Any variations relating to these and to other steps in the Hall process, do not represent invention over the practiced prior art any more than (1) *the choice* of a particular clay belonging to a known class (Mills v. Watson, 1955, 96 U.S.App. D.C. 43, 223 F.2d 335); (2) the suggestion of chlorination of hydrocarbons from a *specifically refined kerosene;* (Application of Inman, Cust.&Pat.App. 1955, 228 F.2d 226) or (3) the suggestion that *electrolytic manganese, a chromium metal,* could be nitrided in lump, when the prior art taught only such process as to *ferrocrome metals.* (Application of Tanczym, Cust.&Pat.App.1957, 241 F.2d 731)

The process in use by Bell-Western Electric was public, open and continuous for a long period of years, extending to the present time. It has proved efficacious, the dry lubricant lasting as long as the parts to which it was applied.

Assume that the Hall process may have elements of superiority, that, as one defense witness stated:

"It is long wearing"

or, as stated by counsel for the defendants at the argument,

"It is a substantially permanent dry lubricant".[4]

This does not stand in the way of finding anticipation by public use in the Bell-Western Electric practice. As said in one of the cases last cited:

"While it may be true that a highly chlorinated product made from a kerosene refined as disclosed in appellant's applicant is superior, and perhaps even unexpectedly superior, to a similar product made from less highly refined kerosene, such superiority does not constitute a basis for the issuance of a patent where the idea of chlorinating the highly refined kerosene to the extent indicated by appellant was fairly suggested by the prior art." Application of Inman, supra, 228 F.2d at page 228.

More, as already appears, the Bell-Western Electric process had the same qualities of durability, lasting as long as the parts to which it was applied. It matters not that Hall, in his long years of search, may not have known of this public use. Once, *as is the case here,* its existence is proved, he is charged with knowledge of it, with fatal consequences to his patent. Derby v. Thompson, 1892, 146 U.S. 476, 481–482, 13 S.Ct. 181, 36 L.Ed. 1051; Lettelier v. Mann, C.C.Cal., 1899, 91 F. 909, 913–914; Dickinson & Co. v. R. P. Scherer Corp., 6 Cir., 1954, 211 F.2d 835, 839.

If, at times, injustice results from applying this rule, it is because the Congress has seen fit to charge the inventor with the full consequences of prior knowledge or use by others. Judge Learned Hand has adverted to the inequity of the situation:

4. Hall is less pretentious. At most he claims a "semi-permanent" character for the lubricant. He states:

"One object of my invention is to provide processes for bonding graphite to the surfaces of articles whereby the graphite is retained *at least semi-permanently* in a position to produce lubrication." (Col. 5, l. 34–37) (Emphasis added)

**804**

"Perhaps it would be desirable that an inventor should not be charged with acquaintance with all that the patent offices of this and every other country contain, and with all that has ever been publicly sold or used in the United States; although in that event it would be an inevitable corollary that infringements should be limited to plagiarisms. With such considerations we have nothing to do; *as the law stands, the inventor must accept the position of a mythically omniscient worker in his chosen field. As the arts proliferate with prodigious fecundity, his lot is an increasingly hard one.*" Merit Mfg. Co. v. Hero Mfg. Co., 2 Cir., 1950, 185 F.2d 350, 352. (Emphasis added)

It follows that, as the patent is invalid under Subdivisions (a), (b) and (g) of Section 102 of Title 35 U.S.C.A., the defendants are not guilty of infringing it.

Declaration will, therefore, be (1) that the patent and all its claims are invalid, and (2) are not infringed, *solely by reason of such invalidity.*