# PETERS *v.* ACTIVE MANUFACTURING COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 65. Argued January 25, 1889.— Decided March 5, 1889.

Claims 1 and 2 of letters patent No. 178,463, granted June 6, 1876, to George M. Peters, for an improvement in tools for attaching sheet-metal moldings, on an application file March 7, 1876, namely, "1. A sheath for applying metallic moldings, said sheath being furnished with a stop for advancing the molding, all substantially as and for the purpose specified;

2. The within described sheath for applying metallic moldings, said sheath being furnished with recesses $f'$ $g'$, and a key G, or their equivalent stops, as and for the purposes explained," cover improvements which are merely adaptations of old devices to new uses, not involving invention.

Claim 3 of the patent, namely, "3. A sheath composed of two grooved bars A E B E', bolts or screws C, and washers D, whereby the sheath is rendered capable of adjustment to contain moldings of different diameters, as herein set forth," is not infringed by an apparatus in which no washers are used for adjustment.

IN EQUITY, to restrain an alleged infringement of letters patent. Decree dismissing the bill, from which complainant appealed.

The case is stated in the opinion.

*Mr. Benjamin Butterworth* for appellant.

*Mr. Arthur Stem* for appellee.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a suit in equity, brought in the Circuit Court of the United States for the Southern District of Ohio, in January, 1882, by George M. Peters against The Active Manufacturing Company, for the alleged infringement of letters patent No. 178,463, granted June 6, 1876, to the plaintiff, George M. Peters, for an improvement in tools for attaching sheet-metal moldings, on an application filed March 7, 1876.

The specification, drawings and claims of the patent are as follows:

" My invention comprises a peculiarly constructed sheath or holder, wherewith the ornamental molding on the top of the carriage dashes may be applied in the most expeditious manner, and without bending or buckling, or otherwise injuring or marring either said molding or its supporting dash-board.

"In its preferred form, said sheath consists of a two-part holder or receiver, connected together with bolts and washers, and provided with a longitudinal groove or channel of such size and shape as to readily inclose the molding that is to be applied to the upper edge of the dash, a key or other suitable

stop being fitted within the sheath, to prevent the molding slipping through said longitudinal groove when the device is in use.

"The sheath is rendered capable of carrying moldings of various lengths and sizes by an arrangement of adjusting devices whose details of construction will be hereinafter more fully explained.

"In the accompanying drawing, forming part of this specification, Fig. 1 is a perspective view of a two-part sheath in an inverted position, the middle portion and rear end of the device being broken away. Fig. 2 is a perspective view of the molding detached from sheath. Fig. 3 is a plan showing the molding located within the sheath. Fig. 4 is a longitudinal section through the rear end of the sheath, with a screw stop for the molding to bear against. Fig. 5 is a transverse section at the line $x$ $x$, showing the molding incased within the sheath; and Figs. 6 and 7 represent modifications of the holder.

"A and B represent two metallic bars of any appropriate size and having their lower outer edges slightly bevelled off at $a$ and $b$. These bars are maintained in a parallel position with reference to each other by means of bolts or screws C and washers or fillings D. Instead of washers and bolts or screws C, the bars may be maintained in parallel position, and separated or brought nearer together, by means of right and left screws, the right-hand thread of said screw engaging a female screw in one bar, and the left-hand thread engaging a female screw in the other.

"The bar A has a longitudinal groove E, formed along its inner surface and near the lower edge of said bar. E' is a precisely similar groove made in the other bar B, and when the two members A B of the sheath are joined together the grooves E E' form a channel that is approximately circular in its transverse section.

"F represents a hook, shackle, or link, pivoted to the front end of the sheath and guttered at $f$, to avoid contact with the upper edge of the dash.

"The bars are furnished with undercut notches $g$ $g'$ to receive a detachable key G, which latter serves as a stop or

abutment for the rear end of the molding to rest against. A series of similar notches may be made in the bars A B at such distances from the front end of the sheath as will correspond with the various lengths of moldings; or, if preferred, the notches and key may be dispensed with, and a screw H may be arranged for the molding to bear against, as seen in Fig. 4. This screw may be adjusted out or in to agree with the length of molding.

"The advancing end of the sheath is rounded off at I, so as not to tear up the leather coverings of the dash while the molding is being applied. The molding consists of a sheet-metal tube J, having a longitudinal slot or parting K, and a flaring or trumpet-mouthed end, L. This trumpet mouth is located at the forward end of the molding.

"As represented in Fig. 7, the sides of the molding M are straight and have an outward flare, the top of said molding being somewhat crowning. This illustration shows a three-part sheath, the two outer bars N N' being secured to the central member O by right and left hand screws n n' and nuts P. Fig. 6 represents the sheath as made of a single piece of metal, or other suitable material.

"Previous to using the sheath the key G is first inserted in the notches g g', at such a distance from the end I as will correspond with the length of molding J, which latter is then slid into the groove E E', the rear end of said molding being brought in contact with the vertical edge of said key. When thus located within the sheath the flaring mouth L of the molding has a slight projection beyond the chamfered end I of the bars A B, as represented in Fig. 3. The carriage dash is then held perfectly rigid, and the upper margins of the coverings of the same are inserted in the flaring end L of the molding, after which any suitable power is applied to the hook F to draw the sheath along the top of said margins or projections. As the sheath advances the flaring mouth serves to conduct the leather margins into the slot K of the molding, and as the grooves E E' prevent any radial distension of the tube J, it is evident that the molding is caused to embrace said margins in the most uniform and secure manner. After the molding has

traversed the entire length of the dash, the sheath can then be retracted, thereby leaving the tube J in its proper position upon the dash, the flaring end L being either filed off or else disposed of in any other suitable manner.   During the progress of the sheath along the top of dash, the molding is impelled forward by the key G, and consequently no strain whatever is brought to bear upon the flaring end L of the tube.

"As a considerable degree of force is required to anchor the molding J securely to the leathern margins, it is evident that the driving action of key G would have a tendency to buckle said tube; but this defect is obviated by making the channel of the sheath of such capacity as to allow a pretty snug fit of the molding within it.

"When a longer molding is to be applied to a dash, the key G is driven out and inserted in another set of notches nearer the rear end of the sheath; or the same results may be effected by causing the molding to abut against the end of screw H, the latter being adjusted either out or in, so as to agree with the length of molding that the sheath is to carry.   The width of channel E E' may be increased, to receive a molding of greater diameter, by removing washers or filling, and inserting thicker ones in their place, or by turning the right and left hand screws, where the latter are employed.

"It is preferred to make the sheath of two pieces, on account of the facility of grooving them; but it is evident the holder may be made of a greater or less number, if desired. (See Figs. 6 and 7.)   It is also preferred to have the sheath embrace the molding as completely as possible, so as to bring the lower edges of the bars A B near the parting K, and thereby prevent any spreading of the tube at said slot; but if the tube is sufficiently stiff to prevent such spreading, the sheath need not surround the molding so completely.   This modified form of sheath is shown in Fig. 6.

"Furthermore, the sheath may be composed of wood lined with a metallic bushing.   It is evident that this form of sheath may be advantageously employed for attaching sheet-metal moldings for tubes to various articles; and I reserve the right to use it for any and every purpose that it is capable of."

"What I claim as new, and desire to secure by letters patent, is

"1. A sheath for applying metallic moldings, said sheath being furnished with a stop for advancing the molding, all substantially as and for the purpose specified.

"2. The within-described sheath for applying metallic moldings, said sheath being furnished with recesses $f'$ $g'$, and a key G, or their equivalent stops, as and for the purposes explained.

"3. A sheath composed of two grooved bars A E B E', bolts or screws C, and washers D, whereby the sheath is rendered capable of adjustment to contain moldings of different diameters, as herein set forth.

"4. The combination of bars, A E B E' and guttered hook or shackle F $f$, for the object stated."

Infringement is alleged of claims 1, 2 and 3.

The defences insisted upon are want of invention, want of novelty and non-infringement of claim 3.

The substance of the invention set forth in the specification is the use of a sheath or holder or receiver, having in it a longitudinal groove or channel, in which is placed the molding that is to be applied to the upper edge of the dash-board, the sheath or holder, when pulled, drawing with it the molding over the upper edge of the dash-board, and the key or stop being fitted within the sheath or holder, to prevent the molding from slipping through the groove. One useful effect of the sheath is to support the molding laterally, and prevent it from bending or buckling, or injuring the dash-board. Claim 1 covers the use of a sheath furnished with a stop, which operates to prevent the further advancing of the molding when it reaches the stop. Claim 2 covers the use of a sheath with a stop formed by means of notches or recesses, and a detachable key to be inserted in the notches. Claim 3 covers a sheath composed of two grooved bars, parallel to each other, and having bolts or screws connecting them, and washers between them, so as to render the apparatus capable of being adjusted to contain moldings of different diameters.

The Circuit Court entered a decree dismissing the bill, from which the plaintiff has appealed. The opinion of that court,

reported in 21 Fed. Rep. 319, says in regard to claims 1 and 2 : " The respondents' evidence establishes that, as early as September, 1867, Joseph P. Noyes, a manufacturer of combs at Binghamton, New York, used a machine for putting moldings on combs, in which the molding was held in a sheath fitting it closely, and having an extension enough smaller to fit the comb.   In this extension there was a sliding follower fitted to abut against the end of the comb.   At the extreme opposite end of the larger part of the sheath there was a slot across the sheath, containing a key or stop to prevent the sliding of the molding.   The follower was attached to a slide and lever, so that when a molding was laid in the larger part of the sheath and the comb in the smaller part, the comb, being prevented from bending by the walls of the sheath, could be forced into the molding by the action of the slide and lever upon the follower, the molding being prevented from bending by the walls of the part of the sheath within which it was placed. This machine was in use more than three years before the date of the complainant's invention.   That this was a comparatively small machine and used only for applying moldings to combs, is not material : *Planing Machine* v. *Keith,* 101 U. S. 490. Nor is it material that the groove or gutter was so open in cross-section that the molding could be dropped into it.   Fig. 6 of the drawings accompanying the letters patent issued to complainant shows a sheath of like shape, and is referred to in the specifications as a modified form of the sheath patented, and the claim is so broad as to cover any sheath, of any material, shape, or size, for applying moldings to any article. There is nothing more in the sheath patented to the complainant than an adaptation of the sheath used at Binghamton to the application of moldings to carriage dash-boards — an adaptation which would have occurred to a skilled mechanic without the exercise of the inventive faculty.   Had the complainant's invention been first in time and patented, the Binghamton sheath would have been an infringement; and, conversely, had the Binghamton sheath been patented, the complainant's would have been an infringement.   That which infringes, if later, would anticipate, if earlier."   We concur in these views.

The affirmative evidence on the part of the defendant, in regard to the Noyes apparatus, consists of the testimony of Noyes and Yingling, their testimony having been taken in August, 1882. Noyes testified that he had been engaged in making combs, at Binghamton, Broome County, New York, since 1860, and had, since 1864, made combs with metallic moldings for stiffening the backs. He produced one of such combs, marked A, and one of such moldings, marked B. He further testified as follows: "Q. 6. State whether or not you have ever used any machinery for putting these moldings on combs? Ans. I have. Q. 7. Can you describe any of the machines used by you for putting moldings on combs? Ans. Yes. I have one machine in which the molding is held in a groove, which fits it closely, and the same groove has an extension enough smaller to fit the comb closely, and in this extension there slides a follower, which is fitted to abut against the end of the comb. At the extreme opposite end of the larger part of the groove there is a slot across the groove, containing a key or stop to prevent the molding sliding through the groove. The follower before mentioned is attached to a suitable slide and lever, so that when a molding is laid in the larger part of the groove, and the comb in the smaller part, the comb, being prevented from bending by the walls of the groove, can be forced tightly into the molding, by the action of the follower and its connected parts, the molding being, at the same time, prevented from bending by the walls of the larger part of the groove. Q. 8. Can you produce a drawing illustrating the machine above described and its operation? Ans. I here produce a drawing which illustrates said machine. In this drawing, figure 1, A represents the main body of the machine. In the part A is the groove C and its smaller extension D, in which are placed the molding and the comb, as described in my previous answer. O represents the slot in which is placed the key, marked figure 2. E, figure 1, represents the follower B, the slide of which the follower forms a part; L, K, M and H the lever and connecting parts by which E and B is operated. Figure 3 shows an end view of the slide and follower. Q. 9. Into which of the grooves do you

place the metallic molding? Ans. Into the groove C. Q. 10. And into which the comb? Ans. Into the groove D. Q. 11. In use, the key or stop, figure 2, is placed in the slot O to prevent the metallic molding sliding, is it not? Ans. It is. Q. 12. State whether the groove C in the sheath A effectually prevents the metallic molding from bending as it is forced over the back of the comb. Ans. It does. Q. 13. State how long you have used the above-described machine for putting metallic moldings on combs in the manner described. Ans. Since September, 1867. Q. 14. Can you fix the date by any positive evidence besides your memory? Ans. I can; I have referred to the time-book of the men who made the machines, and find the machine to have been finished at the date named, and remember that it was put into immediate use. Q. 15. Has it been used ever since? Ans. It has been in continued use ever since without any alteration. Q. 16. Have you ever made any effort to keep its use a secret, or has it always been open to the inspection of any person who might come into your shop? Ans. I have made no effort to keep it secret, but the shop has always been open to visitors, and any one could see the machine who cared to look at it." The drawing so produced, marked C, shows a machine substantially like that of the plaintiff.

Yingling testified that he was, at the time of testifying, in the employ of Noyes, and, since 1868, or for about fourteen years, had used a machine like that shown by the drawing C, above referred to, for putting metallic moldings upon combs.

Noyes had stated, on cross-examination, in answer to a question as to who made the machine he had described as made in 1867, that William Knopp and his son were in his (Noyes's) employ as machinists at that time, and worked some on it; that his time-book, kept at that time, which he had consulted, contained a record of the fact that Knopp and his son so worked on the machine; and that the machine was built during the first week in September, 1867. In rebuttal, the plaintiff examined as witnesses William Knopp and three persons named Newman, Coyle, and McAuley.

Knopp testified that he was employed in Noyes's comb fac-

tory from 1865 to 1869, and was familiar with the kind of machinery manufactured by them during that time, for use in their comb factory. He then proceeded: " Q. 5. In September, 1867, or at any other time, did you make machinery for putting metallic backs on combs? A. I did. Q. 6. Without going into detail as to the kind you did make, I will ask you whether, in September, 1867, you made, or helped to make, a machine for putting moldings on the backs of combs, where the molding is held in a groove which fits it closely, and the same groove has an extension enough smaller to fit the comb closely, and in this extension there slides a 'follower,' which is fitted to butt against the end of the comb. At the extreme opposite end of the groove there is a slot across the groove, containing a key or stop, to prevent the molding from sliding through the groove. The follower is attached to a suitable slide or lever, so that, when a molding is laid in the larger part of the groove, and the comb in the smaller part, the comb is prevented from bending by the walls of the groove, and can be forced tightly into the molding, by the action of the follower and of the connecting parts? A. I do not remember that I made anything of that kind. Q. 7. Did you at any other time make such a machine? A. I don't remember that I did. Q. 8. Please examine the comb I now hand you, and state whether Noyes Bros. & Co., at that time when you worked for them, and since, manufactured a comb with metallic back similar to this one, and, if so, state how said metallic back was put on the comb. [Comb marked Exhibit A shown witness and offered in evidence by solicitor for complainant.] A. They manufactured a comb in general appearance similar. The metallic back was put on and fastened to the comb by compression. The back was compressed in a vice to make it fit in a groove in the comb tightly. The molding was placed on the comb by hand, and then put in a vice, and the molding pressed up tightly against the comb. Q. 9. Do you remember working on or making machinery for compressing the molding on the comb, as above described? A. I do. Q. 10. Is the mode above described the only way Noyes Bros. & Co. put metallic moldings on that kind of a comb? A. It is. Q. 11\

You was familiar at that time with the mode employed by them for putting moldings on combs, was you? A. I was."

This testimony of Knopp is very inconclusive. He merely testifies, thirteen years after he had left Noyes's establishment, that he does not remember that he made, fifteen years before the time when he was testifying, a machine like that described in question 6 put to him. The drawing produced by Noyes was not shown to Knopp.

The testimony of Newman, Coyle and McAuley amounts to nothing. Although they were employed in the comb factory of Noyes at the time they gave their testimony, in December, 1882, and had been employed there, Newman from 1862, Coyle for 14 or 15 years, and McAuley for about 30 years, neither of them was shown the comb A, nor the molding B, nor the drawing C, above mentioned, nor was a distinct question put to either of them as to the use of a machine like that described in question 6 put to the witness Knopp.

The only difference between Noyes's device and that of the plaintiff is, that in Noyes's the stop holds the molding stationary while the comb is forced into the molding by the action of the follower. But its action is substantially the same as that of the stop in the plaintiff's patent, which prevents the molding from slipping through the groove.

The case falls within the principle applied in *Pennsylvania Railroad* v. *Locomotive Truck Co.,* 110 U. S. 490, and cases there cited.

As to the third claim, it is not infringed, because, in the defendant's apparatus, no washers are used for adjustment.

*The decree of the Circuit Court is affirmed.*