Leonard R. KAHN, Plaintiff,

v.

DYNAMICS CORPORATION OF AMERICA, Defendant.

No. 69 Civ. 2783 (CHT).

United States District Court, S. D. New York.

Sept. 14, 1973.

Joseph R. McPhee, Jr., Garden City, L.I., N.Y., for plaintiff.

Thomas M. Ferrill, Jr., Blue Bell, Pa., for defendant.

## OPINION

TENNEY, District Judge.

This is a suit for the alleged infringement of U.S. Patent No. 3,030,503 granted to plaintiff Kahn, a resident of New York, on April 17, 1962 on a "continuation" of Kahn's original application Serial No. 365,964, which was filed July 3, 1953 and abandoned December 13, 1960 after repeated rejections by the Patent Office. The subject matter of plaintiff's patent is an alleged improvement in the field of diversity receiving systems in which two or more radio receivers are utilized in combination to overcome the effects of signal fading resulting in low or negligible signal reception in one or more of the receivers. Defendant, Dynamics Corporation of America ("Dynamics"), is a New York corporation, having its principal office in New York City.[1] Dynamics, through its Radio Engineering Laboratories ("REL") has been a leading manufacturer and supplier of diversity radio receiving equipment. This court has jurisdiction of this action (28 U.S.C. §

1. On August 2, 1972 defendant Dynamics filed a petition for an arrangement under Chapter 11 in the Southern District of New York (In the Matter of Dynamics Corporation of America, 72 B 750). On August 2, 1972 the Referee issued an order staying all litigation against Dynamics. On October 20, 1972 the Referee issued an order vacating, as to the instant case, the stay granted in the August 2 order.

1338 (1970)) and venue is properly laid in this district (28 U.S.C. § 1400 (1970)).

Kahn alleges that claims 15 and 16 of his patent [2] are infringed by the diversity receiving equipment designated as Series Nos. 2300, 2500 and 2600 made and sold commercially by Dynamics.[3] Dynamics contends, after trial of the issues herein to the court, (a) that Kahn has failed to meet his burden of proving infringement; (b) that the Kahn patent is invalid in view of the prior art; (c) that if Kahn's claims (i. e., 15 and 16) could be construed as applicable to Dynamics' diversity receiving systems, said claims would be invalid on the ground of late claiming; and (d) that the Kahn patent is unenforceable against Dynamics because of Kahn's laches.

Before considering Dynamics' defenses to the present action, it is necessary to consider briefly the alleged scope of the Kahn patent. Kahn asserts, in essence, that his patent covers all diversity radio receiving systems in which the outputs of the diversity receiving branches are combined linearly in phase by any circuit which causes their strengths, at the point of combining, to be proportional to the squares of the strengths of the signals picked up by the respective receiving antennas for said signals. Such a system is designed to overcome the problem known as fading. Radio signals, in traveling long distances from the transmitter to a receiver system, may take many paths. While they may, but rarely do, follow the earth's curvature, usually they travel upward away from the earth and are refracted back to the earth by an ionized layer that exists above the earth (the ionosphere). They may be refracted back once, or they may travel back and forth between the earth and the ionosphere many times before they reach the receiver system.

As a result, the signals intercepted by the receiver system antennae may have traveled over widely different paths of unequal distances from the transmitter to the antennae. Since these signals are cyclical in nature, as are all radio frequency signals—i. e., they have crest, or positive and null, or negative portions—the crest of a signal traveling one path may arrive at the same time as the null of the signal traveling another path and, when combined, the positive and negative portions effect complete concellation of each other. Intermediate stages of the relationship of crest and null may result in a weakening of the combined signals or, fortuitously, a major enhancement of the crests arriving at the same time. This continuous variation from a full equivalent to possible cancellation results in the phenomenon known as fading.

Furthermore, radio signal information does not occupy a single frequency but

2. These claims read as follows:
 "15. A diversity receiving system adapted to obtain optimum signal-to-noise ratio comprising means for amplifying a pair of received signals in a pair of separate amplifying channels, means for comparing said signals to determine which is the weaker thereof as well as to determine the ratio of the stronger to the weaker signal, means for reducing the weaker signal and its noise during said signal amplification by a factor equal to the ratio of the stronger to the weaker signal, and means for adding the thus altered ratio signals in-phase subsequent to said signal amplification.
 16. A diversity receiving system adapted to obtain optimum signal-to-noise ratio comprising means for amplifying a pair of received radiant energy transmissions in a pair of separate amplifying channels, the energy in one of said channels having a stronger signal level than the signal level in the energy of the other of said channels, means responsive to comparable portions of the energies being amplified in said pair of channels for determining the ratio of the stronger to the weaker signal in said pair of channels, means for relatively reducing the gain of the amplifying channel associated with the weaker one of said signals by a factor equal to the determined ratio of stronger to weaker signal, and means for adding the thus altered ratio signals in-phase."

3. It was stipulated that Series 2500 is representative of the Series 2300.

must include a band or range of frequencies, and each frequency is affected differently by the refractions from the ionosphere and the surface of the earth. Consequently, the band of frequencies received at one antenna over one path may not be of equal strength or signal level across the whole frequency band. This produces a fading effect known as selective fading. Kahn's patent is directed to a diversity reception system for improving signal strength in relation to noise level in which two or more receivers are simultaneously employed to receive signals transmitted over substantial distances and in which, after linear amplification and demodulation, the signals are combined in phase according to the rule of the ratio of the square of the incoming signals; e. g., if the incoming signals have relative amplitude of three-to-two they will be combined in the ratio of nine-to-four. No claim is made, nor could it be, that Kahn invented diversity reception or even a diversity reception system in which signals are combined.

 With regard to the issue of infringement we must recognize the fundamental principle that an invalid patent cannot be infringed. John Deere Company of Kansas City v. Graham, 333 F.

2d 529, 530 (8th Cir. 1964), aff'd, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). We must likewise recognize that a patent is presumed valid and the burden of establishing invalidity rests on the party asserting it. *John Deere Company, supra,* 333 F.2d at 530. However, the presumption of validity is rebuttable, and when substantial evidence attacking the validity of a patent is introduced, the question of whether the patent constitutes an invention is then for the court, and the presumption is weakened if applicable prior art was not considered by the Patent Office. *John Deere Company, supra,* 333 F.2d at 530. Accordingly, we look first to the prior art and then to such disclosures of the prior art as were made to the Patent Office.

As early as 1931, Peterson, Beverage and Moore (engineers with the Radio Corporation of America ("RCA")) had successfully placed in operation a diversity receiving system for trans-Atlantic radiotelephone service which was used for many years for rebroadcasts of programs originating abroad. The RCA engineers described their system in the Proceedings of the Institute of Radio Engineers ("I.R.E.").[4] This system

4. H. O. Peterson, H. H. Beverage, and J. B. Moore, "Diversity Telephone Receiving System of R.C.A. Communications, Inc.", 19 Proceedings of the I.R.E. 562 (1931). Kahn's knowledge of this article appears more than likely. For a period of one year, from mid-1951 to mid-1952 Kahn's then employer, Crosby Laboratories ("Crosby"), carried out an investigation, under a U.S. Army Signal Corps contract, of the relative merits of different kinds of diversity radio receiving systems, wherein some of the different ways of utilizing the varying outputs of the plural radio receiving branches were analyzed and compared. Kahn was a main participant in this project. The first of four reports on this investigation reviewed and described several already known diversity receiving systems. Among these, and at pages 35–37 of said report, was an analysis and summary of the triple-diversity (three-branch) radiotelephone receiving system created and described by RCA engineers Peterson, Beverage and Moore in their article. It was noted in the Crosby report that the ra-

tios of the combining were in accordance with the squares of the ratios at the branch antenna inputs, and, furthermore, the report observed that this was consistent both with what the RCA engineers themselves stated in their I.R.E. paper at page 567 and Terman's summary thereof in his textbook, Radio Engineering 491–92 (1st ed. 1932).
Excerpts from the Crosby report follow:
"In their equipment, the signal detectors are of the square law variety with the plates of the combining detectors connected together. Common automatic gain control is used. *It is pointed out that the signal output is proportional to the square of the received signal intensity.* Therefore, if the stronger signal is twice as strong as the weaker signals, there will be four times as much output derived from the stronger signal.
\* \* \* \* \*
"*The importance of common automatic gain control operation was recognized in this article.* It was realized that if separate AGC's were used, the receiver

caused to be added together the detected signals, as received and amplified, with a common automatic gain control ("AGC") (sometimes referred to as an automatic volume control ("AVC")) resulting in ratio squaring of the signals. In accordance with the practice prevalent at that time, they used square-law detectors, which are special devices for withdrawing the modulation, or the audio wave, from the modulated wave.

In 1937, Friis and Feldman of Bell Telephone Laboratories ("BTL") described, in a paper,[5] a three-branch diversity receiving system and explained, with mathematical proofs, the signal-to-noise improvement made available by ratio squaring, the combining system they used therein, and concluded that, theoretically, ratio squaring was the maximal combining ratio.

Polkinghorn of BTL analyzed the Peterson, Beverage and Moore paper, and acknowledged the signal-to-noise improvement from ratio squaring, duplicating their work successfully. He also developed a triple-diversity receiving system for a multiple unit steerable antenna ("MUSA") receiving station employing single sideband with reduced carrier, which he described in the Proceedings of the I.R.E.[6] Polkinghorn provided a carrier reconditioner for each branch and successfully used circuits arranged to give ratio-squared operation, rather than equal gain combining, in order to enjoy the resulting improved signal-to-noise performance.

In 1939, patent applications were filed by Polkinghorn and by Oswald, another BTL engineer, for certain versions of ratio-squared diversity receiving systems—applications which issued as patents numbered 2,219,751 and 2,219,749, respectively, on October 29, 1940. In each of these patents, a common AGC is employed. In his patent, Polkinghorn relied on controlled gain amplifiers to inject controllably varied strengths of carrier frequency oscillations into his square-law detectors. Oswald, however, in his patent, did not rely on square-law detectors but used each of his gain-controlling rectifiers to control either an intermediate frequency amplifier stage just ahead of his detector (as Kahn would eventually propose in the patent in suit) or an audio amplifier stage responsive to the detector output. Oswald specified that the gain of his controllable amplifier is varied in proportion to the branch input signal strength. This is the condition which, in the Kahn patent disclosure, and identically in the Oswald patent disclosure, provides ratio squaring. That is, the signal versions as combined in each of these patents (Kahn's patent and the prior Oswald patent) are each proportional to the square of the corresponding antenna input signals.

In 1954, Kahn submitted a letter to the Institute of Radio Engineers recommending ratio squaring, which was published in the Proceedings of the I.R.E.[7] Although, as previously indicated, Kahn must have been aware of the prior work of Peterson, Beverage and Moore in which they had, decades earlier, combined components from their three diversity branches in proportion to the

---

supplying the weakest carrier would have the greatest gain and therefore the outputs of the component receivers would be almost equal." (Exh. CC at 35–36) (emphasis added)

Furthermore, the third quarterly Crosby report (Exh. DD at 25) noted that the use of ratio-squared combining had been analyzed and reported in the second quarterly Crosby report (not available), and the final report (Exh. EE at 21–30) recorded the comparison experiments conducted with ratio-squared combining, equal-gain combining and certain other modes.

5. H. T. Friis and C. B. Feldman, "A Multiple Unit Steerable Antenna for Short-Wave Reception," 25 Proceedings of the I.R.E. 841 (1937).

6. F. A. Polkinghorn, "A Single-Sideband Musa Receiving System for Commercial Operation on Transatlantic Radiotelephone Circuits," 28 Proceedings of the I.R.E. 157 (1940).

7. Leonard R. Kahn, "Ratio Squarer," 42 Proceedings of the I.R.E. 1704 (1954).

squares of the antenna input signals, he omitted any mention of that fact in his paper. Nor did he make any reference to the fact that each branch of the Peterson, Beverage and Moore diversity system used the then prevalent square-law detector, providing the diversity combining performance gain, with the signal-to-noise ratio improvement of ratio squaring, over a single receiver of similar vintage and similar prevailing detector type. As will be seen, Kahn, who had omitted in his I.R.E. paper any acknowledgment of what the RCA engineers had done long before, also omitted any such acknowledgment to the Patent Office, both initially and throughout the prosecution of his applications.[8] Furthermore, Kahn misrepresented the Oswald patent to the Patent Office examiner in a final, and unsuccessful, attempt to secure his patent.

As has been noted, the presumption of validity which attaches to a patent is weakened if applicable prior art is not considered by the Patent Office. *John Deere Company, supra,* 333 F.2d at 530. Accordingly, we turn to an examination of the prosecution of the patent claim in the Patent Office. On July 3, 1953 Kahn's original application, Serial No. 365,964, was filed. In that application he described and claimed a diversity radio receiving system having at least two branches, with a common AGC system provided to regulate the amplification (gain) of groups of intermediate-frequency amplifier stages in all branches in accordance with the signal strength in the strongest branch. In addition, a separate controlled-gain amplifier was provided in each branch, and so arranged as to have its gain varied in proportion to the signal strength of that branch, with the result that the versions of the demodulated signals as combined were proportional to the squares of the

antenna input signal strengths. As indicated *supra,* Kahn did not disclose to the Patent Office his knowledge or the existence of the 1931 paper by Peterson, Beverage and Moore describing RCA's diversity radio receiving system having a common AGC system to regulate the amplification (gain) of groups of intermediate-frequency amplifier stages in all branches in accordance with the signal strength in the strongest branch, the circuits being so arranged that the versions of the demodulated signals as combined were proportional to the squares of the antenna input signal strengths.

On March 19, 1954, and again on November 14, 1956, Kahn's application was rejected as unpatentable over the Oswald Patent No. 2,219,749 granted October 29, 1940. On each occasion it was argued on behalf of Kahn that there was no teaching in Oswald of the specific ratio-squared relationship taught by Kahn. On January 30, 1958 the original application was again rejected for the same reasons and the rejection was made final. On July 30, 1958 both an appeal and an amendment acknowledging an interview with the examiner and arguing against the final rejection were filed to the Patent Office Board of Appeals. This amendment presented a new argument against a rejection based upon the Oswald patent—*i. e.,* that the Oswald patent does not provide for in-phase combination of signals, which Kahn asserted was essential to achievement of results in accordance with his proposal. The amendment was refused entry, and, after the filing of a brief on behalf of Kahn, the examiner's answer, and Kahn's reply, Kahn abandoned the original application and a "continuation" application was filed on December 13, 1960.

A letter accompanied this application urging its allowance, which set forth, in

---

8. Reference has already been made to Kahn's knowledge of the prior work of the RCA engineers referred to, and among the material upon which he relied before the Patent Office was an article by Dr. Brennan (D. G. Brennan, "Linear Diversity Combining Techniques," 47 Proceedings of the I.R.E. 1075 (1959)) in which Brennan made reference to the Peterson, Beverage and Moore system as probably being the maximal ratio system. Yet Kahn never cited this to the Patent Office.

particular, arguments with respect to the Oswald patent and included a list of publications purporting to demonstrate widespread recognition in the art of Kahn's alleged contribution. On June 20, 1961 the continuation application was likewise rejected as being substantially met by Oswald. Following this rejection, Kahn, and his attorney, presented arguments in support of Kahn's position at an interview with the examiner and the assistant primary examiner. The substance of these arguments was subsequently set forth in an amendment filed on August 18, 1961. One of the contentions made was that the system described by Oswald could not work because of random phase variations of the components to be added, which effect resulted from the use of a single oscillator coupled to Oswald's second detectors of both branches. But such contention ignores the fact that Oswald's patent describes reconditioning the reduced-amplitude carrier of the incoming signal of *each* branch and introducing each branch's reconditioned carrier into its second detector.[9] By so proceeding on the basis of the Oswald patent specification, the random phase problem would be avoided and the system disclosed in that patent, using reconditioned carriers in each of the branches as specifically taught by the patent, would operate as a satisfactory diversity system to effect ratio-square combining without any difficulties due to phase inconsistency.[10] This is borne out by the testimony of defendant's experts Brennan, Mack, and Bingley.

It is well settled that, in considering anticipation by prior art, the entire disclosure in a reference must be evaluated for what it fairly teaches one

9. Page 3, Col. 2, lines 6–29 of the Oswald Patent read as follows:

"If it should be desired to effect a greater degree of frequency stability, this may be done in the manner disclosed in Patent 2,041,855 to R. S. Ohl, issued May 26, 1936. That is, the filtered carrier received from the transmitting station may be reconditioned and then used for obtaining automatic frequency control of the beating oscillator 20 and synchronization of the local carrier oscillator 30. Or, if desired, in accordance with the disclosure of the Ohl patent, the filtered carrier after being reconditioned and amplified may constitute the source of locally applied carrier oscillations in place of the local carrier oscillator 30. As disclosed in the Ohl patent, the reconditioned carrier is supplied for demodulation at substantially constant amplitude regardless of fading in transmission, and therefore, if applied in the present system in substitution of the carrier oscillations generated locally by oscillator 30, the system is susceptible of and requires the same automatic gain control in accordance with the amplitude of the rectified received carrier energy of the corresponding branch that is utilized in the present invention."

10. In addition to having "overlooked" the workable means described in the Oswald specification, Kahn, and/or his attorney, misrepresented the meaning of two selected phrases from the Brennan paper (D. G. Brennan, "Linear Diversity Combining Techniques," 47 Proceedings of the I.R.E. 1075, 1081 (1959)) so as to conceal their real purport when read in context. Brennan, in pointing out that a maximal-ratio diversity system (ratio squarer diversity) "is a definite improvement over either scanning diversity or selection diversity" stated that "[t]his *observation* is essentially due to Kahn," noting however, that it was quite possible that the diversity system discussed by Peterson, Beverage and Moore in the Proceedings of the I.R.E. of April 1931 was actually a *maximal-ratio system*, albeit they referred to it with a connotation of switching. In their interview with the examiners, Kahn, and/or his attorney, according to the Remarks which they submitted, stated, in inviting the attention of the examiner to the Brennan paper, that Brennan had written that this type of system "is essentially due to Kahn." Thus, they attributed to Kahn not merely an observation of the advantages of the maximal ratio system, but the origination of it. Significantly, they continued to avoid calling attention to the Peterson, Beverage and Moore paper. Kahn claims that the Peterson paper was called to the attention of the examiner because Kahn called his attention to an "attack" on Kahn's 1954 letter to the I.R.E. by Moore, a co-author of the Peterson paper, in which "attack" Moore referred to the Peterson paper. However, Kahn did not furnish the examiner with a copy of the Moore "attack". Rather, he furnished only a copy of Kahn's reply, which made no mention of the Peterson paper.

of ordinary skill in the art. In re Mills, 470 F.2d 649, 651 (C.C.P.A.1972); In re Boe, 53 C.C.P.A. 1079, 355 F.2d 961, 965 (1966).

■ While in general it is true that the presumption of validity of a patent may be strengthened where the Patent Office has granted it in the face of certain prior art—here the Oswald patent—this is not so where the Patent Office has been deceived as to the true significance of a reference. As was stated in Marasco v. Compo Shoe Machinery Corp., 325 F.2d 695, 697 (1st Cir. 1963):

"It is true that the Patent Examiner cited the Malverdi patent in allowing Marasco's claims, but any presumption of validity to be gathered from that fact has been sufficiently overcome. Also, there is indication that the examiner's judgment may not have been based on evidence completely accurate. We are referring to a letter sent to the examiner by Marasco's attorney informing the examiner that the handle of the 'Ghini' machine was held in operative position only by manpower. The text of the Italian patent, a translation of which was possessed by the plaintiffs, stated the exact opposite."

See also Ansul Company v. Uniroyal, Inc., 301 F.Supp. 273, 280 (S.D.N.Y. 1969), aff'd, 448 F.2d 872 (2d Cir. 1971), cert. denied, 404 U.S. 1018, 92 S. Ct. 680, 30 L.Ed.2d 666 (1972).

■ It must also be understood that the prior art, even if embodied in the file wrapper and presumably considered by the examiner in the Patent Office, involved only an ex parte presentation, whereas at the trial, defendant Dynamics offered the testimony of several experts which disclosed that the alleged invention was "obvious" to a skilled electrical engineer such as Kahn. Richmond Screw Anchor Co. v. Superior Concrete Accessories, 256 F.2d 232 (2d Cir. 1958). Significantly, neither of plaintiff's expert witnesses contradicted defendant's witnesses although they had considered the prior art in preparing to testify. Indeed, one of plaintiff's experts, Hekimian, admitted he was not familiar with the Oswald patent and "would not care to comment on it."

■ It is clear that Kahn made no new contribution to the art, but at most republicized what had much earlier been developed and published by others, at least some of which he had encountered in his work for Crosby Laboratories.[11] The subject matter of his patent is fully anticipated by, and certainly obvious, in view of the work of Peterson, Beverage and Moore at RCA as well as the work of Polkinghorn, Oswald, Friis and Feldman at BTL. Kahn's argument that all the prior art material relied upon by defendant, in addition to the Oswald patent, was "indirectly before the Patent Office" is specious. Moreover, the prior art referred to and relied upon by defendant does teach the principle of combining signals in a diversity receiving system in accordance with the ratio square law. They are all valid references against Kahn under 35 U.S.C. § 102 (1970), and in any event under 35 U.S.C. § 103 (1970), even though they employ circuitry different from that employed by Kahn to achieve ratio-squared combining. Furthermore, whether or not they attained ultimate perfection, the circuits, in operation, provided signal-to-noise benefit similar to that asserted by Kahn.

Moreover, the Oswald patent not only contains a full disclosure of the principle of ratio-squared combining in a diversity system, but indeed its mode of operation and the circuitry employed therein are essentially similar to those disclosed by the Kahn patent. The "hypothetical" circuit prepared by defendant's expert Bingley (Def.'s Exh. AA) was, in effect, Oswald's circuit incorporating the change which Oswald had himself proposed as disclosed in the Ohl patent (Patent No. 2,041,855 to R. S. Ohl issued May 26, 1936).[12] There is no evi-

11. See note 4 *supra.*

12. See note 9 *supra.*

dence that the Ohl patent was considered by the examiner or that Kahn called it to his attention. Thus, we have a circuit (Kahn's) anticipated by Oswald with one possible distinction which, however, was also anticipated by another patentee (Ohl). All of the elements of the Kahn circuit were, therefore, anticipated by the prior art. Sensytrol Corp. v. Radio Corporation of America, 190 F.Supp. 121, 125 (S.D.N.Y.), aff'd, 289 F.2d 938 (2d Cir. 1961). The patent in suit is accordingly invalid as anticipated by the prior art under the provisions of 35 U.S.C. § 102 (1970). Moreover, even if not fully anticipated by the prior art, any "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person" such as Kahn, and, therefore, the patent is accordingly invalid under 35 U.S.C. § 103 (1970).

 However, even if the Kahn patent were not invalid under the provisions of 35 U.S.C. §§ 102 and 103, the Court would still be constrained to find for defendant. The only claims of that patent as to which plaintiff attempted to prove infringement are claims 15 and 16. These claims are invalid because no claims of a substantially similar scope were presented to the Patent Office—either in the original patent application filed July 3, 1953 and abandoned December 30, 1960, or in the continuation application as filed December 13, 1960—until more than one year after equipment substantially the same as that charged to infringe had been on sale and delivered to customers. Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942); Chicopee Mfg. Corp. v. Kendall Co., 288 F.2d 719 (4th Cir.), cert. denied, 368 U.S. 826, 82 S.Ct. 44, 7 L.Ed.2d 29 (1961).

 The claims which issued as patent claims 15 and 16 were first introduced by Kahn as application claims 24 and 25 by amendments of the continuation application filed in August and November 1961. Kahn argues that there was no change to the drawings or specifications in the patent except for the addition in a drawing of an insignificant resistor requested by the patent examiner, and, more importantly, that the claims sought on filing were much broader than those obtained on issue. However, it is immaterial to the defense of late claiming whether or not the claims in suit were supported by the application as originally filed. The dispositive question is whether or not they are directed to essentially the same subject matter as claims originally presented. If they are not, but rather are directed to more specific subject matter which has been in public use or on sale more than one year prior to the presentation of these or substantially similar claims in the patent application, then it is immaterial that broad, unpatentable claims were presented in the application as originally filed. The applicability of the late-claiming defense is not dependent on whether the claims in issue are based on new matter added to the disclosure subsequent to the filing of the application, and is not rendered inapplicable because broader claims were present in the application as originally filed. Rather, this defense relies on the fact that the claims are directed to subject matter not essentially the same as that originally claimed in the application, and which indeed may be more specific and limited than those originally presented.

No claims corresponding in scope to claims 15 and 16 of the Kahn patent were presented in the application as originally filed. Diversity receivers of the type charged by Kahn to infringe claims 15 and 16 of his patent had been on sale and delivered to users by defendant Dynamics more than one year before any claims of this scope were presented in either of Kahn's two patent applications. Accordingly, if claims 15 and 16 could be construed to read on defendant's receivers, they would be invalid under *Muncie, supra,* 315 U.S. 759, 62 S.Ct.

865, 86 L.Ed. 1171, and *Chicopee, supra*, 288 F.2d 719.

Mindful of the authoritative suggestion in Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945), that the District Court in an infringement suit inquire fully into the validity of the patent claimed to be infringed,[13] this Court declined to dismiss the infringement claim at the conclusion of plaintiff's affirmative case and permitted the case to continue so that defendant could attempt to sustain its burden of showing the patent to be invalid and thus noninfringeable. Although, as has been found, the patent and, more specifically, the claims alleged to have been infringed are invalid, the court further finds that even if such invalidity did not exist, no sufficient proof of infringement has been adduced. Indeed, not only did plaintiff fail to sustain his burden of proving infringement, but defendant has proved by a clear preponderance of the evidence that its accused system does not infringe.

As previously explained, the Kahn patent is directed to diversity receiving systems in which versions of signals recovered through plural diversity receiving branches are combined in proportion to the squares of their signal strengths at the branch receiver input connections. The patent contemplates that this combining in such proportions occurs no matter how greatly different are the relative strengths of the signals supplied to the various branches. Defendant's systems do not operate in this manner. They are hybrid systems in which, whenever the signals in the branches differ in strength by less than two-to-one, such signals are combined in a ratio which is a varying exponential power (of the order of the sixth power) of the ratio of the input signal strengths. When the incoming signals of the branches differ in strength by more than a two-to-one ratio, only the signals from the branches having the stronger input contribute to the output, the weaker signal contributions being effectively switched off. In short, *defendant's systems are both combining and selective.*[14]

On his direct examination, plaintiff's expert ineffectually tried, with the benefit of two charts, to show how the clauses of claims 15 and 16 of the Kahn patent could be applied to defendant's receivers. In attempting to construe the claims, he paid no attention to the related prior art, which would be the logical starting point for both construing the claims and for determining Kahn's advance (if any) over the prior art which, in turn, would be used for the purpose of determining the scopes of the claims and considering the question of infringement. Additionally, he completely ignored the relation between the element clauses of the asserted claims and the Kahn specification, contrary to the last paragraph of 35 U.S.C. § 112 (1970).[15]

---

13. *But see* Harries v. Air King Products Co., 183 F.2d 158, 161–162 (2d Cir. 1950) as to appellate review of both infringement and invalidity.

14. After the initial interest in ratio squaring, combining limited to a narrow range came to be recognized as quite advantageous. After having advised government agencies to call for ratio-squared combining in their specifications for diversity receiving equipment, Mack and his colleagues at MIT's Lincoln Laboratory came to the realization that it is disadvantageous to use ratio squaring when the received signals in the branches differ greatly, *e. g.*, for signal ratios such as $\frac{1}{3}$, $\frac{1}{4}$, $\frac{1}{5}$, $\frac{1}{8}$ or $\frac{1}{10}$. Altman of IT&T, and Mellen of Lincoln Laboratory independently recognized that it would be desirable to use equal-gain combining (rather than ratio-squared combining) for so long as the weaker of the combined signals is not much weaker than $\frac{1}{2}$ the strength of the stronger branch input signal, and to cut off the weaker channel completely when its signal becomes appreciably weaker than $\frac{1}{2}$ the stronger-branch input signal strength.

15. Section 112 provides in pertinent part:
"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

Both of claims 15 and 16 recite a plurality of means for performing specified functions. However, plaintiff's expert made no effort to consider these various means clauses in the light of the disclosure of the patent to determine what their proper range of equivalents should be for the purpose of determining infringement.

Plaintiff attempts to invoke the doctrine of equivalents, asserting that even if defendant's accused diversity receiving systems do not literally infringe the claims of the Kahn patent, nevertheless infringement may be found on the basis that those systems perform substantially the same function in substantially the same way and for substantially the same purpose as purportedly defined in the Kahn claims. In support of the application of the doctrine, plaintiff suggests that the accused systems differ from what is defined in his patent claims only in what he contends are minor respects amounting to obvious engineering differences which are not material—namely, (a) that they effect signal control in response to out-of-band noise rather than in response to signal level *per se,* and (b) that they use parallel rather than series combining. However, it is clear that there are even more significant differences between defendant's systems and the subject matter of the Kahn claims. One important distinction is that defendant's systems do not use ratio squaring, the "essence" or "principle" which Kahn has attempted unsuccessfully to appropriate as his own.[16] In order to make out a case for infringement, Kahn would have had to show not only that defendant's receivers do use square-law (*i. e.,* ratio-squared) operation, but also that they use the same

kind of means as claimed by him to provide it—a burden which he could not sustain.

■ In short, plaintiff failed to make out a case of infringement. His expert witness was unable to arrive at any definitively understood relation between the claims in suit and the disclosure in Kahn's specification and drawings. Although the expert acknowledged that since claims 15 and 16 consist exclusively of means claims they are required to be interpreted by reference to the specification,[17] he failed to resolve the relation between the claims' clauses and the specification. In prosecuting his infringement suit, Kahn wishes his patent to be treated as though he had invented ratio-squared combining and, thus, that he should be entitled to a patent monopoly over any conceivable form of receiving system using in any way this approach for enhanced signal-to-noise ratio in diversity reception. However, in attempting to support the validity of his patent he argues for strict construction of his patent and rules out any prior art where the ratio of the inputs are not precisely squared. By his approach to the infringement issue he would have to assert that Peterson et al., Oswald, and Polkinghorn were infringers except for the fact that they long preceded him with their ratio squared combining diversity systems. But "[t]hat which infringes, if later, would anticipate, if earlier." Peters v. Active Mfg. Co., 129 U.S. 530, 537, 9 S.Ct. 389, 392, 32 L.Ed. 738 (1889). "It is hornbook patent law that if a reference would have infringed, if later, it anticipates, if earlier." Ritter v. Rohm & Haas Co., 271 F.Supp. 313, 335 (S.D.N.Y.1967). Therefore, assuming *arguendo*

---

16. Kahn attempts to refute defendant's contention that its receivers do not use ratio squaring by citing to a pre-trial stipulation, with respect to defendant's accused diversity receiving systems, to the effect that "the way in which the outputs of the different branch receivers are utilized in diversity reception" is as described in the instruction manuals in evidence relating to those systems. He points to selected portions of

these manuals, taken out of context, as supporting the conclusion that the accused systems have related essence to what he claims; *e. g.,* he argues that "post-detection optimum ratio band combining" really means ratio squaring, although the evidence does not support such contention.

17. See note 15 *supra.*

the validity of the patent and the particular claims thereof allegedly infringed, it is clear that plaintiff has completely failed to sustain his burden of proving infringement. In view of the foregoing, it is unnecessary to consider the defense of laches raised herein.

■ Finally, we reach defendant's claim that it is entitled to an award of reasonable attorney's fees under 35 U.S. C. § 285 (1970). As this court has had occasion to state, "only where the court is convinced that the patent is so wholly devoid of substance that the plaintiff could not have had a bona fide belief in its validity shall it award the defendant reasonable attorneys' fees pursuant to 35 U.S.C. § 285." Indiana General Corp. v. Krystinel Corp., 297 F.Supp. 427, 449 (S.D.N.Y.1969), aff'd, 421 F.2d 1023 (2d Cir. 1970), cert. denied, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970). As has been shown, plaintiff deceived the Patent Office both as to the highly pertinent Peterson, Beverage and Moore paper with which he had become familiar while working for Crosby Laboratories,[18] and with respect to the true nature and capabilities of the system disclosed in the Oswald patent. He argues, but without conviction, that the Patent Office must have known of the "historic" Peterson et al. paper and that that office could read the Oswald patent as well as he could. But the record does not support his argument that the Patent Office did know of the relevancy of the Peterson et al. paper, and, as has been shown, the Patent Office was misled by plaintiff as to the Oswald patent.

"A patent applicant's breach of duty to the Patent Office is relevant in determining not only the validity of his patent, but also his good faith in maintaining a subsequent infringement action. An applicant's fraud on the Patent Office is enough standing alone to convert his later infringement action into an exceptional case within the meaning of section 285. But conduct short of fraud and in excess of simple negligence is also an adequate foundation for deciding that a patent action is exceptional." Monolith Portland Midwest Co. v. Kaiser Aluminum and Chemical Corp., 407 F.2d 288, 294 (9th Cir. 1969).

*See also* Shelco, Inc. v. Dow Chemical Co., 466 F.2d 613, 618 (7th Cir.), cert. denied, 409 U.S. 876, 93 S.Ct. 125, 34 L. Ed.2d 129 (1972); Contour Saws, Inc. v. L. S. Starrett Co., 444 F.2d 1331, 1335 (1st Cir. 1971).

■ Moreover, while the Court has not found it necessary to pass upon the defense of laches, the facts which have been adduced in support of that defense are relevant to the issue of plaintiff's good faith in bringing this law suit. Less than six months after his patent had issued and in September 1962, Kahn charged that defendant's laboratories (REL) could "raise an infringement question with respect to" the patent now in suit. Thereafter, REL's attorneys made a study of the Kahn patent and, on November 4, 1963, wrote plaintiff's attorneys advising that, for the reasons set forth in that letter, it was clear that there was no possible infringement. Ten days after defendant, on June 16, 1969, had written Kahn's attorneys explaining in greater detail why there was no infringement Kahn instituted the present suit. In the three-year period from that date to the commencement of the trial on June 12, 1972 plaintiff apparently made no efforts, through discovery or otherwise, to ascertain the difference between defendant's systems and the claims of his patent.[19]

---

18. See note 4 *supra.*

19. Defendant duly proceeded with written interrogatories under Rule 33 of the Federal Rules of Civil Procedure ("FRCP"), motions for production under Rule 34 FRCP, a deposition of plaintiff, and depositions of two elderly witnesses, Peterson and Polkinghorn. From June 1969 to May 1972 (a month before trial) plaintiff took none of the available discovery steps. On May 10, 1972 (more than one year after the date set by the court for completion of all discovery) plaintiff presented defendant with a broad

In the light of the complete inadequacy of plaintiff's case on infringement, the Court can only conclude that plaintiff's purpose in bringing suit was to compel defendant to obtain a non-exclusive license under the patent rather than face the expenses of trial.[20] Plaintiff personally, during the discovery portion of the case, completely failed to make a substantially meaningful showing of grounds for his infringement allegation. Neither in his deposition on oral examination nor in his response to the written interrogatories did plaintiff ever provide definitive identification of a combination of elements in the accused receivers to which he could demonstrate the applicability of the respective clauses of a claim or claims of his patent, element by element. The infringement question in this case is not close enough as to be a matter upon which informed, reasonable counsel or scientifically informed, reasonable men might differ, and plaintiff failed to use reasonable care in assessing his infringement allegation prior to bringing suit. On the other hand, defendant, prior to institution of the suit, informed plaintiff of the differences between its product and the claims allegedly infringed in a futile attempt to avoid costly litigation. In the instant case, therefore, the obvious absence of infringement may be equated with bad faith on plaintiff's part. Kaehni v. Diffraction Co., 342 F.Supp. 523 (D.Md.1972), aff'd without opinion, 473 F.2d 908 (4th Cir. 1973), pet. for cert. filed, 42 U.S.L.W. 3001 (U.S. June 25, 1973) (No. 73–2).

## CONCLUSIONS OF LAW

1. The Kahn Patent No. 3,030,503 is invalid under 35 U.S.C. §§ 102 and 103 (1) since it is anticipated by the Oswald Patent No. 2,219,749 showing substantially the same combinations of elements as described in the Kahn patent, and (2) since it is obvious to those skilled in the area in view of the prior art including the Peterson, Beverage and Moore paper;[21] the Terman text "Radio Engineering";[22] the Polkinghorn paper;[23] the Polkinghorn Patent No. 2,219,751; The Friis and Feldman paper;[24] the Oswald Patent No. 2,219,749; and the Ohl Patent No. 2,041,855.

2. The Kahn patent is invalid because of plaintiff's failure to disclose material facts of which it was aware, and its arguments wherein the contents of the Oswald patent and the Brennan paper[25] were materially misrepresented.

3. Claims 15 and 16 of the Kahn patent could not be valid claims of the scope asserted by plaintiff because the subject matter of such claims was first asserted in and after August 1961, more than one year after equipment identical to that charge to infringe had been on sale and had been delivered to customers.

4. The Kahn patent is not infringed by defendant, for the reason, *inter alia,* that an invalid claim cannot be infringed.

5. Plaintiff, in any event, has failed to present evidence competent to sustain its burden of proving infringement.

6. The Kahn patent is not infringed, since the claims of that patent are limited to ratio-squared combining or to such variation of diversity branch receiver amplification as only to square the input signal ratios, where defendant's diversity systems raise their signals to greater

---

informal request for production of documents and defendant produced several manuals relating to its receiver systems pursuant to this request. These are the manuals upon which plaintiff bases his contention that defendant's receivers employ ratio squaring. (See note 16 *supra.*)

20. While under the circumstances of this case, the fact that certain companies had accepted licenses under the Kahn patent and made certain payments for a short period to Kahn cannot be given weight as tending to support the validity of the patent, that fact is relevant as to Kahn's motive in pursuing the unwarranted infringement claims.

21. See note 4 *supra.*

22. Id.

23. See note 6 *supra.*

24. See note 5 *supra.*

25. See note 8 *supra.*

exponential powers than 2 (the square), and switch off the weaker signal except when the signal strengths are within a ratio of about 2:1.

7. The complaint is dismissed with costs to defendant. Furthermore, this case is exceptional within the purview of 35 U.S.C. § 285 and defendant is entitled to an award of attorneys' fees, to be determined on the basis of evidence to be presented in support thereof.

Submit judgment in conformity herewith on five (5) days' notice within ten (10) days of the filing of this opinion.